Robert E. SCHNEIDER, Jr. et al., Plaintiffs,

v.

COLEGIO DE ABOGADOS DE PUERTO RICO et al., Defendants.

Civ. Nos. 82–1459, 82–1513, 82–1514 and 82–1532.

United States District Court, D. Puerto Rico.

June 16, 1983.

Robert E. Schneider, Jr., Santurce, P.R., pro se and for plaintiffs.

Salvador Antonetti, Jay Garcia-Gregory, San Juan, P.R., Miriam Naveira de Rodón, Santurce, P.R., José Julián Alvarez González, University of Puerto Rico, Rió Piedras, P.R., for Justices of Supreme Court P.R.

Pedro A. del Valle Ferrer, Federal Litigation Div., Dept. of Justice, San Juan, P.R., for Secretaries of Justice & Treasury.

Harry Anduze Montanõ, Santurce, P.R., for Colegio & Fundación de Abogados.

## MEMORANDUM OPINION

TORRUELLA, Chief Judge.

The issues presented by these cases go to the very heart of the speech and associational freedoms protected by the First Amendment to the Constitution of the United States. More accurately stated, these cases involve Plaintiffs' constitutional "right not to speak or associate at all—that is, a right to be free from governmental compulsion to engage in speech or associational activities."[1] In these actions, all filed pursuant to 42 U.S.C. § 1983, Plaintiffs challenge the prospective[2] validity of various Puerto Rican statutes which create,[3] and financially support,[4] Puerto Rico's integrated bar association, the Colegio de Abogados de Puerto Rico, hereinafter called the "Colegio". It is claimed that these laws are invalid because they force Plaintiffs to belong to, and financially support, an organization which promotes ideological and/or political causes which are contrary to Plaintiffs' personal beliefs.

The procedural and non-central issues raised by Defendants' responsive pleadings have been previously decided by the Court. See *Schneider v. Colegio de Abogados de Puerto Rico,* 546 F.Supp. 1251 (D.P.R.1982) aff'd in part, reversed in part *sub nom., In Re Justices of Supreme Court of Puerto Rico,* 695 F.2d 17 (CA 1, 1982). The issues remaining to be decided are thus reduced to, (1) a factual determination as to whether or not the Colegio engages in ideological and/or political activism, (2) if so, whether it is the result of or is supported by governmental action, and finally, assuming that the previous questions are answered in the affirmative, (3) a determination of the legal consequences resulting therefrom. *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Arrow v. Dow,* 636 F.2d 287 (CA 10, 1980), on remand 544 F.Supp. 458 (D.N.M.1982).

### The Colegio's Ideological and/or Political Actions

There is no question but that the Colegio engages in ideological and/or political activism of a pervasive and continuous nature, totally unrelated to the stated legislative purposes for which it was created.[5] Among the activities which may be classified as ideological and/or political in nature [5a] are the following:

(4 L.P.R.A. 785); Law No. 99 of June 27, 1956 (hereinafter Law 99) (4 L.P.R.A. 1001 *et seq.*).

1. Gaebler, "First Amendment Protection Against Government Compelled Expression and Association", 23 B.C.L.Rev. 995 (1982). See also *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

2. See *District of Columbia Court of Appeals v. Feldman,* (1983), — U.S. ——, 103 S.Ct. 1303, 75 L.Ed.2d 206. See also *Schneider v. Colegio de Abogados de Puerto Rico,* 546 F.Supp. 1251, 1267–1268 (D.P.R.1982) aff'd in part, reversed in part *sub nom., In Re Justices of Supreme Court of Puerto Rico,* 695 F.2d 17 (CA 1, 1982); see also *Piper v. Supreme Court of New Hampshire,* 708 F.2d 825, at 828, n. 4 (CA 1 1983).

3. Law No. 43 of May 14, 1932 (hereinafter Law 43) (4 L.P.R.A. 771 *et seq.*).

4. Section 11 of Law 43 (4 L.P.R.A. 783), Law No. 115 of May 6, 1941 (hereinafter Law 115)

5. 4 L.P.R.A. 772 states that:
   "The Bar Association of Puerto Rico shall have the following duties: (1) to cooperate in the improvement of the administration of justice; (2) to render such reports and give such advice as the government may require of it; (3) to defend the rights and immunities of lawyers and to procure their enjoyment in the courts of the liberty necessary for the proper exercise of their noble profession; (4) to promote fraternal relations among its members, and (5) to maintain healthy and strict professional morals among the members."

5a. It is easier to talk about "ideological" and "political" activities than to define these terms. The *Encyclopaedia Britannica* defines "ideology" as a form of social or political philosophy, a system of ideas that aspires both to explain the world and to change it. *Encyclopaedia*

(1) At least since 1973,[6] the President[7] of the Colegio has made annual appearances before the United Nations to present the "official" position of the Colegio with regard to the political status of the Commonwealth of Puerto Rico to the effect that the Commonwealth is a colony of the United States, and to request that the "case" for its decolonization be submitted for action to the United Nations General Assembly. This position is espoused as representing the views of *all* the members of the Colegio.[8]

*Britannica,* 15th Ed., s.v. "ideology". *The International Encyclopedia of the Social Sciences* defines this term as "one variant form of those comprehensive patterns of cognitive and moral beliefs about man, society, and the universe in relation to man and society, which flourish in human societies." *International Encyclopedia of the Social Sciences,* s.v. "ideology". The word "ideology" first made its appearance in France as *idéologie* during the French Revolution when introduced by a philosopher, A.L.C. Destutt de Tracy, as a short name for what he called his science of ideas. The "science of ideas" was a science with a mission; it aimed at serving men, even saving them, by ridding their minds of prejudice and preparing them for the sovereignty of reason. Thus "ideology" has been from its inception a word with a marked emotive content. The subject of ideology is a controversial one, and it is arguable that at least some part of this controversy derives from disagreement as to the definition of the word "ideology". One can however, discern both a strict and a loose way of using it. In the loose sense of the word, ideology may mean any kind of action-oriented theory or any attempt to approach politics in the light of a system of ideas. Ideology in the stricter sense stays fairly close to Destutt de Tracy's original conception, and may be characterized by five characteristics: (1) it contains an explanatory theory of a more or less comprehensive kind about human experience and the external world; (2) it sets out a program, in generalized and abstract terms, of social and political organization; (3) it conceives the realization of this program as entailing a struggle; (4) it seeks not merely to persuade but to recruit loyal adherents, demanding what is sometimes called commitment; (5) it addresses a wide public, but may tend to confer some special role of leadership on intellectuals. See generally: Destutt de Tracy, *Elémens d'Idéologie,* 2nd ed. (1817); See Generally, John Plamenatz, *Ideology* (1970); R.H. Cox (ed.) *Ideology, Politics and Political Theory* (1969); George Lichtheim, *The Concept of Ideology* (1967).

*Abood v. Detroit Board of Education, supra,* gives us a definition of "political activity" which suffices for the moment:

"... [An] attempt to influence governmental policymaking ..." 431 U.S. at 231, 97 S.Ct. at 1797 (1977).

Perhaps we should adopt a position similar to that espoused by Justice Stewart in *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964), when attempting to define obscenity and pornography, which he deemed was equivalent to "trying to define what may be indefinable." He conceded that "perhaps [he] could never succeed in intelligibly doing so. But [he knew] it when [he saw] it," a position not too distant from the Court's in this case.

6. A ten year period back from the date of the trial was used as background to the issues raised by this case.

7. The Colegio is governed by a general assembly and a Governing Board. 4 L.P.R.A. 776. The latter is composed of the Colegio president, twenty-eight delegates and the outgoing president, who sits as an ex-officio member without voting power. Twenty-four of the delegates are elected by twelve different regional delegations, each of which elect two delegates for a two-year term. The Colegio President and the other four at-large-delegates are elected at the general assembly also for a two-year term. 4 L.P.R.A. 777. The Colegio president runs the Colegio on a day-to-day basis through the Colegio's executive secretary, appointed by him with the Board's approval. The Board meets frequently to pass upon the resolutions of the Colegio, which as will be seen, cover a wide range of matters.

8. In his 1973 appearance, the current president of the Colegio, Arturo Negrón García, who was also president at that time, stated that the position assumed before the United Nations represented the position "consistently assumed [by the Colegio] during the last 30 years through its General Assembly, which represents the feelings of the 3,000 lawyers who practice in Puerto Rico. "See Plaintiffs' Exhibit 23, p. 332. At this hearing the Colegio introduced, as part of its presentation, (1) a resolution adopted by the General Assembly of the Colegio on September 1, 1944 among other things "denouncing ... the colonial government ... [which was maintained] ... in power ... only by force ... and coercion [of the United States]" and authorizing that expenses be incurred by the Colegio to correct this situation (*Id.,* p. 342), (2) the report of the Constitutional Law Committee of the Colegio approved by the General Assembly of February 21, 1963, expressing the substantive requirements acceptable to the Colegio of the three political status formulas to be considered in any plebiscite, and (3) a report of the sub-

The appearances by the Colegio before the United Nations' Decolonization Committee, as well as the substance of the Colegio's position therein, have received wide-spread publicity in Puerto Rico and in the international news media.

(2) The Board of Governors has adopted many resolutions dealing with diverse topics of an ideological and/or political nature. These include among others: condemning the Federal Bureau of Investigation for "intervention" with the Puerto Rican independence movement and its leaders (Plaintiffs' Exhibit 44); opposing an increase in the number of Federal Judges in Puerto Rico as an "attempt to fortify Federal Control over the island contrary to the duty of Congress to recognize the right of Puerto Rico to assume full sovereignty" (Plaintiffs' Exhibit 46); requiring that the President of the United States order the Navy to cease target practice in the island of Vieques and withdraw therefrom," and that this resolution be sent to the Puerto Rican Legislature, to Congress, to the President, to the Decolonization Committee of the United Nations and to the media for massive promulgation" (Plaintiffs' Exhibit 49); [9] resolving to "orient and inform" the people of Puerto Rico regarding the resolution of the Decolonization Committee of the United Nations regarding Puerto Rico (Plaintiffs' Exhibit 235 at p. 14. Resolution No. 6); condemning the Legislature of Puerto Rico for its "distortion [of] the historical truth" in condemning the previously referred to resolutions of the Decolonization Committee (Plaintiffs' Exhibit 235 at p. 29, Resolution No. 14); requesting the President of the United States that he release four Puerto Rican Nationalists convicted of participating in the shootings in Congress in 1952 (Plaintiffs' Exhibit 61); opposing a new voter identification system proposed by the Puerto Rico Electoral Committee (Plaintiffs' Exhibit 62); repudiating the Somoza regime in Nicaragua, supporting the Sandinista Front of National Liberation, and asking the United States to recognize the "Provisional Government of National Reconstruction "(Plaintiffs' Exhibit 235 at p. 66, Resolution No. 32); condemning the Russian invasion of Afghanistan (Plaintiffs' Exhibit 235 at p. 91, Resolution No. 43); expressing support for Olympic sports and that the Puerto Rico Olympic Committee be the one to decide whether or not to boycott the Moscow Olympic Games (Plaintiffs' Exhibit 235 at p. 92, Resolution No. 44); stat-

committee of the Committee on the Constitutional system of the Colegio adopted by the General Assembly on September 2, 1972, dealing with the juridical relations between Puerto Rico and the United States.

This matter was published *in toto* in the Colegio's law review. See 35 *Rev.Col.Ab.P.R.* 329 (1974).

Also published therein was the testimony of Colegio President Graciany Miranda Marchand before the Decolonization Committee on August 15, 1977. 39 *Rev.Col.Ab.P.R.* 157 (1978). See Plaintiffs' Exhibit 237. In this appearance the Colegio basically reiterates the position previously indicated regarding the alleged colonial status of Puerto Rico.

The testimony of Colegio President Luis F. Camacho before the Decolonization Committee in August 1981 and 1982 was published in Colegio newsletters. See Plaintiffs' Exhibit 238 and 239. In them the Colegio president, "speaking" for the 6,000 odd members of the Colegio, again sought United Nations intervention to end Puerto Rico's alleged colonial status "maintained by force by the United States while exercising an intolerable degree of juridical coercion". Exhibit 238, p. 2.

In fact, if not in law, when a Colegio president "speaks" for the membership he can hardly claim unity. In 1974, the Colegio sponsored an empirical study of the attitudes of the membership toward the Colegio and the reasons for these attitudes. This study, which was directed by the then dean of the Law School at the University of Puerto Rico and the present-day President of Catholic University, revealed a very low level of participation or support of the Colegio's activities by its membership, a situation attributed in some measure to the Colegio's intervention in political activism. See Jaime B. Fuster, "Los Abogados de Puerto Rico", pp. 64, 76–82 (Plaintiffs' Exhibit 8)

**9.** The annual assembly of the Colegio, at its September 2, 1978 meeting adopted a similar resolution (Plaintiffs' Exhibit 52). This same assembly passed a resolution seeking an investigation by various entities including the United Nations, the Civil Rights Commission and various others (including the Colegio's own Civil Rights commission) of the shooting by the police of two independence advocates while allegedly attempting to destroy communications facilities in Cerro Maravilla, Puerto Rico (Plaintiffs' Exhibit 51.)

ing the Colegio's concern "in the name of all qualified voters" as to the state of the electoral process and authorizing the president of the Colegio to name a committee "to watch and guarantee the purity of the electoral process" (Plaintiffs' Exhibit 235 at p. 102, Resolution No. 51); expressing the Colegio's solidarity with the people of El Salvador and condemning the governing Military Junta (Plaintiffs' Exhibit 235 p. 114, Resolution No. 2); endorsing and supporting a march to be held favoring the movement to get the Navy to leave Vieques (Plaintiffs' Exhibit 236 at 129, Resolution No. 10); asserting the "defense" of Puerto Rican culture and rejecting "the efforts of the Commonwealth with relation to the Institute of Puerto Rican Culture as attempts to destroy the cultural heritage of Puerto Rico" (Plaintiffs' Exhibit 235 at p. 135, Resolution No. 13); criticizing the United States for transferring Haitian refugees to Puerto Rico and demanding their immediate release to the mainland (Plaintiffs' Exhibit 235 at p. 149, Resolution No. 21); condemning the United States "for imposing a concentration camp on Puerto Rico in complicity with the Government of Haiti" (Plaintiffs' Exhibit 235 at p. 167, Resolution No. 30); opposing the use of the Federal Grand Jury system in Puerto Rico (Plaintiffs' Exhibit 235, at p. 137, 151, 162, Resolutions Nos. 14, 22, 28); blaming the police and the University Administration for the use of force in a strike by students at the University of Puerto Rico (Plaintiffs' Exhibit 235 at p. 201, Resolution No. 42); condemning the draft as a "blood tax paid by Puerto Ricans in the four wars fought in the Armed Forces of the United States" (Plaintiffs' Exhibit 235 at p. 203, Resolution No. 43);

All of the above have been widely disseminated by the Colegio throughout the news media, as a matter of practice and routine.

(3) The physical facilities of the Colegio have been routinely used for ideological and/or political activities unrelated to the purposes of the Colegio. These activities have included among others: [10] a concert to raise funds for the accused in the armed robbery of a Wells Fargo truck; a press conference by the "Committee for the Defense of Our Dignity"; a press conference by the "Committee for the Defense of Democracy in Haiti"; numerous press conferences by labor unions; assembly of the "National Committee for the Defense of Vieques"; meetings of the "Committee for the Selection of Celeste as Mayor"; a press conference of the "Pastors' Association"; a seminar about the "organizational and political aspects of the Grand Jury"; press conferences of the Puerto Rican Socialist Party; press conference of the "United Committee Against Repression"; public hearing of the Central Committee of the Popular Democratic Party; meetings to organize a defense committee by the Puerto Rican Socialist League; a meeting of the leadership of the Popular Democratic Party in San Juan; a meeting of the San Juan Zone of the Puerto Rican Socialist Party; an organizational meeting of "Citizens interested in the improvement of TV"; meetings of the "Crusade for the Rescue of Vieques"; a press conference of the "Artists in Favor of Artistic Freedom"; commemoration of the anniversary of the death of Dr. Pedro J. Chamorro; [11] a press conference of the "Committee for the Defense of Puerto Rican Culture"; a press conference and meetings of the "Committee for the Defense of Nicaragua"; meetings of the "Law Students' Council" in connection with the strike at the University of Puerto Rico; a concert by the "Committee for the Defense in Support of the Puerto Rican Prisoners of War; [12] a press conference of the "Committee for the Rescue of Villa Sin Miedo",[13] as well as various meetings and

---

**10.** See Plaintiffs' Exhibits 247, 248, 249, 250.

**11.** A Nicaraguan journalist killed during the Sandinista revolution in Nicaragua.

**12.** A euphemism for the alleged FALN terrorists arrested in the Mainland.

**13.** A community of squatters on government land which had to be forcedly evicted by the Police after various legal proceedings in the Commonwealth Courts. See *Miguel Gonzalez Rodriguez, et al. v. Autoridad de Tierras de Puerto Rico, et al.*, Num. 0–81–694 (Supreme

conferences related thereto; a movie-showing by "Claridad", the official newspaper of the Puerto Rican Socialist Party, dealing with education in Cuba; a press conference by the Federation of University Students for Independence in connection with the "situation" at the University of Puerto Rico; an activity of the Puerto Rican Socialist Party in support of Cuba; a "cultural-political" activity by the "Committee for the Defense of Nicaragua"; a press conference by the local of the Professional Air Traffic Comptrollers Organization regarding their negotiations and strike; a showing of the movie "El Salvador; the people shall triumph," by the "Puerto Rican Committee in Solidarity with the Salvadorian People," as well as numerous other activities by said organization; a conference by the Dominican Revoluntiary Party; meetings and press conferences of the "Committee Against the Uniform Increase in Tuition" of the University of Puerto Rico; a press conference of the Vieques Fishermen's Association regarding military maneuvers in the Caribbean Area; a press conference by the "Puerto Rican Ecumenical Social Action Committee" about the role of the "Church in the 80's"; an organizing meeting of the New Progressive Party followers of "Hernan Padilla for Governor"; the annual assembly of the "Puerto Rican Confederation of Spiritualists"; a press conference of the "National Ecumenical Movement" in support of the people of El Salvador.

Many of these activities were held without any charge being made by the Colegio to the sponsoring group, or with only a nominal fee being charged.[14] Irrespective of whether or not a charge is made for the use of the Colegio's facilities, because of the continuous nature of these activities and the widespread publicity given to the fact that they take place in the Colegio's premises, a general impression is given that the Colegio is somehow associated in an active manner with at least some of these activities. This general impression is buttressed by the nature of the resolutions approved by the Board to which we have previously alluded, many of which in fact appear to complement the above-mentioned activities. The Colegio's total failure to disavow its sponsorship of the activities held within its premises does nothing to dissipate this impression.

(4) The Colegio also sponsors various publications. These include a law review, a monthly news letter[15] and the miscellaneous reports of its various committees. Several resolutions and proceedings of the Board of Governors and of the general assembly, of an ideological or political nature, have been published in the Colegio's law review,[16] a publication which receives wide dissemination in and outside Puerto Rico. Additionally, the law review publishes some articles which can only be cataloged as political or ideological rhetoric, with little, if any, relationship to the workings of a law journal.[17] The monthly news letter is also

---

Court of Puerto Rico, Sentence of March 16, 1982).

14. The charging of a fee for the use of the Colegio's facilities is at the discretion of the Colegio's president. See Plaintiffs' Exhibit 3 at p. 8. In some of the above mentioned activities, fees of between $100–$300 were charged.

15. "Factum"

16. See Footnote 8 herein. See also 34 *Rev.Col. Ab.P.R.* 515–530 (1973); "Informe sobre los Asuntos Acontecidos en la Universidad de Puerto Rico Recinto de Río Piedras Durante la Huelga Estudiantil en esa Institución," 43 *Rev. Col.Ab.P.R.* 527–563 (1982).

17. See Mari Bras, "La Jornada de 1978 en Naciones Unidas" 42 *Rev.Col.Ab.P.R.* 555 (1981);

Correa Benitez "Semblanza de Juan Antonio Corretjer", 42 *Rev.Col.Ab.P.R.* 1 (1981); Aponte Vazquez, "Necator Americanus: Sobre la Filosofía del Caso Rhoads", 43 *Rev.Col.Ab. P.R.* 117 (1982); Marcksoud López and Serrano García, "El Mito de la Democracia: Apuntes Sobre la Cultura Política Puertorriqueña", 43 *Rev.Col.Ab.P.R.* 359 (1982). It should be noted that none of the Colegio's publications contain any disclaimer, as is common in the publications of many professional associations, to the effect that material published in its publications is not the official position of said organization unless specifically adopted thereby, or words to said effect. For example, the "American Bar Association Journal" indicates in its publication: "As it is one objective of the *American Bar Association Journal* to be a forum for the free expression and interchange of

used to disseminate the resolutions of the Board of Governors, some of which as previously indicated, have a strong ideological or political content.[18] The program for the annual general assembly is also a source of publicity for ideologically-tainted resolutions,[19] and is used as well for other proselytizing purposes.[20]

Related to the above are the various committees and commissions of the Colegio.[21] These groups issue reports on matters, including ideological and political issues, many of which have been the basis of the resolutions previously referred to herein.[22] Many of these reports have been independently published by the Colegio, and their contents have received wide publicity and circulation throughout the Colegio membership and the general public.

(5) The Colegio has appeared either through testimony or by written briefs, before Congressional committees and before committees of the Legislature of Puerto Rico to present institutional views on behalf of the Colegio membership regarding pending legislation and other matters of a political and/or ideological nature. Examples of these activities include appearances before Congressional Committees considering legislation dealing with migrant farm workers, and similar appearances to oppose legislation to increase the number of District Judges in the United States District Court

---

ideas, the opinions and position stated in signed material are those of the authors and not by the fact of publication necessarily those of the American Bar Association or the *Journal* . . ." See 69 *ABA Journal* 550 (May, 1983); 37 *The Business Lawyer* (back page) (April, 1982).

**18.** See Plaintiffs' Exhibit 251, various copies of "Factum".

**19.** See Plaintiffs' Exhibit 6a–6d.

**20.** See Plaintiffs' Exhibit 6a. The cover page of this program is dedicated to Emeterio Betances, a deceased independence leader (See back page of Exhibit 6a). In the President's message, at page 5, then president Graciany Miranda Marchand states that "the Colegio has returned to its position in the vanguard leadership of Puerto Rican society. We have not refused to be involved in controversy nor have we remained neutral nor indifferent, on the contrary, the Colegio has contributed to the discussion of the problems which ail our people".

See also Plaintiffs' Exhibit 6b, p. 1. Here the annual assembly of the Colegio is dedicated to Pedro Albizu Campos, the leader of the Nationalist Party which has brought about various violent activities in Puerto Rico (ex. the Nationalist Revolt in 1950) and in the Mainland (ex. the attack on Blair House and Congress in 1952). The President's message, again makes a point of indicating the Colegio's "unquestionable leadership . . . in the discussion and defense of the public matters which affect our Homeland." *Id.*, p. 5.

In Plaintiffs' Exhibit 6c, the cover page of the general assembly program and the general assembly itself, are dedicated to paying homage to the people of Vieques, with whom the Colegio is said to "have a firm and unbreakable obligation of solidarity in its fight" against the U.S. Navy. The message by then president Angel Tapia Flores was no less eloquent in stating what he considered to be the issues at hand: ". . . [T]he People of Puerto Rico and all our legal prefession have felt the presence of the Colegio, from Vieques to Washington. To date, there has not been one significant issue generated in this country as to which the Colegio de Abogados de Puerto Rico has failed to advise and illustrate our people. It would be difficult indeed to make a list of all these matters. You know them and the People of Puerto Rico know them, and that's good enough for us." *Id.* p. 5. And "that" is what *this* case is about!

See also the President's message at page 5 of Plaintiffs' Exhibit 6d, where among other things, it is said that "the militant participation of our Colegio aimed at eliminating the military bases of the North American Navy from our National territory in Vieques produce in us a feeling of happiness, satisfaction and hope."

**21.** The permanent committees are provided for in the by-laws of the Colegio, which also grant the president or the Board of Governors the authority of creating special committees. See Article 44, Plaintiffs' Exhibit 5. The members of all committees are named by the president of the Colegio.

**22.** See for example: "Informe de 1980-Factores Exteriores que afectan el Sistema Constitucional de Puerto Rico", of the "Comisión Para el Estudio del Sistema Constitucional de Puerto Rico", Plaintiffs' Exhibit 245; "Informe Sobre el Derecho Constitucional a Fianza", of the Civil Rights Committee, Plaintiffs' Exhibit 253;

for Puerto Rico.[23] Colegio President Tapia Flores also appeared in person before a committee of Congress considering the enactment of Spanish language legislation for the U.S. District Court in Puerto Rico. On a second occasion he appeared before a committee investigating Naval activities in Vieques. Colegio President Negron García appeared before the Puerto Rico Legislature to condemn the Electoral Law of Puerto Rico, and to state the Colegio's position as to "what the electoral process in a democracy should be."

There is no question but that in the carrying out of the above mentioned ideological and/or political activities the funds, resources and facilities of the Colegio have in varying degrees been used to support and promote said activities. Furthermore, there is no way of determining, from an accounting standpoint,[24] the dollar amount of this support except to conclude that from the pervasiveness, scope and breadth of this type of activity, it is obvious that the backing has been and is considerable.

The above findings are almost superfluous, as the Colegio hardly denies that it engages in ideological activities. In its Post-Trial Memorandum the Colegio states: "The Colegio de Abogados is an entity designed with a pluralistic purpose not as a private club or fraternity immersed only in the defense of its class interest." [25] It continues to expound that: "[T]he Colegio has an unquestionable value that goes beyond the narrow interest of lawyers as a class, to benefit the good administration of justice and the social advancement of the community. This value resides in the special function the Colegio plays together with other similar professional associations, in providing independent voices to participate and strengthen our democratic way of life." [26] It argues that: "[I]t is also proper, for the state to request from the organized bar reports and advice on such areas of great public importance where lawyers because of their training and experience, are especially fitted to evaluate the same." [27] Furthermore, it is the position of the Colegio that it can and will continue to engage in ideological activities,[28] a position which is hardly discouraged by the Supreme Court of Puerto Rico's decision in *Colegio de Abogados de Puerto Rico v. Schneider et al,* 112 D.P.R. (1982), 82 JTS 51, wherein it states, after harking back to the philosophical roots of the Colegio as laying in the bar associations of France and Spain where ". . . the Bar's role was, from time immemorial, a primarily political one," [29] that "[i]n the case of Puerto Rico, the [Colegio] need not be a quiet and blushing entity, afraid to use the voice granted to it by the very pluralistic purpose it should serve. . ." [30] Finally we have, that although Plaintiffs' complaints charge the Colegio with engaging in "ideological and partisan" activities [31], Colegio's denial is limited to "partisan" activities only.[32]

We conclude this part of our opinion by saying that if one thing is clear in this case, it is the proliferation of Colegio's ideological and/or political activities. We thus pass on to our next point of inquiry.

*State Action in the Support of Colegio's Ideological and Political Activities*

The Colegio admits to being "a quasi-public corporation created by the Legislature of

see also the various committee reports in Plaintiffs' Exhibit 251.

23. As can be seen from Plaintiffs' Exhibit 46, the opposition to this legislation was strictly based on ideological grounds.

24. Testimony of Juan Espiet, the Colegio's Auditor.

25. Colegio's Post-Trial Memorandum, at p. 25.

26. *Id.,* p. 44.

27. *Id.,* p. 47.

28. See the testimony of Colegio President Arturo Negrón García.

29. See 82 JTS 51 at p. 2524.

30. *Id.* That decision is itself a recognition that the Colegio engages in ideological activities. *Id.* 82 JTS at p. 2525.

31. See Plaintiffs Schneider's and Ramos' Complaint (Case No. 82–1459) Paragraphs 25E, 26 and 33.

32. See Answer at Paragraphs 3 and 5.

Puerto Rico to perform functions vested with a great public interest".[33] Although in a slightly different context, the Court of Appeals for the First Circuit recently stated in *Piper v. Supreme Court of New Hampshire,* 708 F.2d 825 (CA 1 1983), that:

"The relationship between control over state bar membership and a state's ability to function as a sovereign political body is very close. The bar is a vital component of the state judiciary which, together with the executive and legislative branches, constitutes an essential ingredient of state government. Although not state employees, lawyers have long been considered officers of the Court. This designation does not refer to the fact that lawyers are officials capable of exercising judicial powers, but rather to the fact that lawyers are closely associated with, and have important responsibilities to a state's court." (At p. 830, citations omitted)

Law 43, which as we know establishes the integrated bar of Puerto Rico, charges the Colegio with the duty of "cooperat[ing] in the improvement of the Administration of Justice [and] to render such reports and give such advice as the Government may require of it." 4 L.P.R.A. 772(1), (2). Additionally, the Colegio has the power, subject to the approval of the Supreme Court of Puerto Rico, "[t]o adopt and establish ... the rules of professional ethics that shall govern the conduct of lawyers," as well as to receive and investigate complaints, and "institute proper disbarment proceedings"

before the Supreme Court. 4 L.P.R.A. 773(f), (g). Further intertwining the Colegio's role with that of the courts, the Supreme Court of Puerto Rico has long insisted, and frequently reiterated, its inherent power to regulate the legal profession, at times with the Colegio acting as the prosecutor. *Colegio v. Schneider, supra; In re Liceaga,* 82 P.R.R. 245, 248 (1961); *In re Andreu,* 81 P.R.R. 87, 117 (1959); *In re Pagán,* 71 P.R.R. 712, 714 (1950); *In re Abella,* 67 P.R.R. 211, 219 (1947); *In re Gonzalez,* 65 P.R.R. 357, 367 (1945); *In re Bosch,* 65 P.R.R. 232, 234 (1945); *In re Arroyo,* 63 P.R.R. 764, 766 (1944); *Guerrero v. Court of Tax Appeals,* 60 P.R.R. 236, 244–247 (1942); *Ex Parte Jimenez,* 55 P.R.R. 51 (1939); *In re Tormes,* 30 P.R.R. 248 (1922). And in the present case, of course, we have the additional factor that some Plaintiffs, in addition to being lawyers are also notaries, a position highly embued with the state's imprimatur.[34]

But the state action which supports the Colegio goes much farther than merely requiring mandatory membership in the Colegio as the *quid pro quo* to the practice of the legal-notarial profession in Puerto Rico. 4 L.P.R.A. 774, 1002. The Commonwealth of Puerto Rico provides financial support to the Colegio to an extent and in a manner unprecedented within any other jurisdiction in the United States. Not only does Law 43 provide for the mandatory payment of dues to the Colegio,[35] with suspension from the practice of law for non-payment thereof,[36]

---

**33.** See Colegio's Post-Trial Memorandum, p. 24. See also Section 1 of Law 43 (4 L.P.R.A. 771).

**34.** In Puerto Rico only lawyers admitted to the practice of law can be notaries. 4 L.P.R.A. 1002. In a Civil Law jurisdiction such as Puerto Rico, notaries perform functions of a much more far-reaching nature than that of notary publics in Common Law jurisdictions. They are more than mere oathtakers. They perform highly important duties with regard to the validation and authorization of all kinds of public instruments under the Civil Law, such as deeds, wills, powers of attorney, etc. See 4 L.P.R.A. 847–858, 881–895, 921–927, 1001–1040. Although they are not considered public officers as such, they exercise public functions. *People v. Central Cambalache,* 62 P.R.R. 530

(1943); *In re Melendez Perez,* 104 D.P.R. 770, 775–776 (1976). Cf, *Piper v. Supreme Court of New Hampshire, supra.* As Colegio states in its Post-Trial Memorandum: "A lawyer who chooses to become a notary public becomes a functionary of the Commonwealth of Puerto Rico and when he acts as such notary public exercises state powers: he acts in a public capacity and not as a private citizen." See footnote at page 49 of the Colegio's Post-Trial Memorandum.

**35.** 4 L.P.R.A. 780.

**36.** 4 L.P.R.A. 781. Practice during the suspension for non-payment can lead not only to contempt of court charges, *Bar Ass'n of Puerto Rico v. Fajardo,* 51 P.R.R. 512 (1937), but also to criminal prosecution. 4 L.P.R.A. 782.

but it also requires that each lawyer, upon filing his first document in any judicial proceeding before the Commonwealth courts, must cancel and attach to said document a "forensic stamp" as a condition precedent to such filing.[37] Additionally, a "notarial stamp" must be affixed to the original and all certified copies of all public instruments executed by a notary-lawyer, without which said document is "considered null for all purposes."[38] Although the Commonwealth's offices of collection of internal revenue provide the facilities for the sale of these "bar stamps, notarial stamps, or any other special stamps adopted and issued by the [Colegio]", the *entire* proceeds of said sales are remitted by the Secretary of the Treasury to the Colegio, for its use, without restriction except that "at least, one third of the total resources received [from the notarial stamps must be devoted] to community service programs such as free legal assistance to indigent persons, continuous community legal education programs, and other analogous programs."[39]

State action is sufficient for Section 1983 purposes where the state and the entity in question maintain a sufficiently interdependent or symbiotic relationship, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), where the state requires, encourages or is otherwise significantly involved in the questioned conduct, *Lombard v. Louisiana,* 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1961), or where the entity exercises a traditional state function. *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). See also *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836,

92 L.Ed. 1161 (1948); *Downs v. Sawtelle,* 574 F.2d 1 (CA 1), *cert. denied* 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978); *Rivas Tenorio v. Liga Atletica Interuniversitaria,* 554 F.2d 492 (CA 1 1977). *Jackson v. Statler Foundation,* 496 F.2d 623 (CA 2 1974); *Ludtke v. Kuhn,* 461 F.Supp. 86 (S.D.N.Y. 1978); *Stewart v. New York University,* 430 F.Supp. 1305 (S.D.N.Y.1976); *Rackin v. University of Pennsylvania,* 386 F.Supp. 992 (E.D.Pa.1974). In *Jackson v. Statler Foundation, supra,* the Court summarizes:

"A review of the 'state action' case law suggests five factors which are particularly important to a determination of 'state action': (1) the degree to which the 'private' organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which [it] serves a public function or acts as a surrogate for the state; (5) whether the organization has legitimate claims to recognitions as a 'private' organization in associational or other constitutional terms.

Each of the factors is material, no one factor is conclusive." See 496 F.2d at 629.

The Colegio clearly meets at least four of these five criteria. The Colegio's dependency on governmental aid, both in terms of the mandatory membership dues and as provided by the forensic and notarial stamps, is almost exclusive. Secondly, the government's regulatory scheme is all-pervasive. Thirdly, that the Colegio serves a public function, at the very least in its

---

**37.** 4 L.P.R.A. 783; *Lopez Rivera v. Matos,* 101 D.P.R. 740 (1973).

**38.** 4 L.P.R.A. 1006. Failure to comply with this requirement will also subject the notary-lawyer to disciplinary action before the Supreme Court and will prevent, in the case of a deed, registration in the Registry of Property. Cf. *Rosario v. Registrar,* 65 P.R.R. 436 (1945).

**39.** 4 L.P.R.A. 785, 1006. Cf. Article 59 of Colegio's by-laws. Plaintiffs' Exhibit 4. In con-

sidering the extent of the Commonwealth's involvement in the Colegio's affairs, it is interesting to note that 4 L.P.R.A. 785(b) provides:

"That pending the liquidation and reimbursement of the total value of the stamps delivered to the Secretary of the Treasury, the proceeds from the stamps sold, as well as the stamps still unsold, shall be considered, for all purposes to be of the same character and condition as securities of the Commonwealth of Puerto Rico, in the possession of the Secretary of the Treasury."

prosecutorial activities in helping to regulate the legal profession, cannot be questioned. Fourth, both the Colegio and Law 43 refer to the Colegio as a "quasi-public" entity, a description which is not merely a figure of speech, but which the facts bear out.

█ The Colegio's symbiotic relationship to the various[40] branches of the Commonwealth's government can only lead us to conclude that its actions are permeated with the "color of law." We thus hold that the Colegio's ideological and political activities as previously described herein, are state action within the meaning of 42 U.S.C. § 1983. See *Arrow v. Dow, supra;* Cf. *Dist. of Col. Court of Appeals v. Feldman, supra.*

Nor do Defendants seriously contest this issue. The gravamen of their opposition, apart from the preliminary questions previously decided by the Court,[41] are concerned with the *consequences* of this state action, a matter which we will now discuss in detail.

### The Consequences of the Colegio's Ideological and/or Political Activities

█ It is well established that it is a violation of an individual's First and Fourteenth Amendment rights for the state to coerce support of ideological and/or political causes. *Abood v. Detroit Board of Education, supra; Arrow v. Dow, supra;* Cf. *Galda v. Bloustein,* 686 F.2d 159 (CA 3, 1982). Whatever else *Abood's* diverse opinions may stand for, the Court was unanimous in holding that the use of mandatorily required fees for ideological and/or political purposes violated the First Amendment interests of persons to be free "to associate for the advancement of ideas, or to refrain from doing so, as [they] see fit."[42] In fact

the Court quoted Thomas Jefferson to the effect that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." 431 U.S. at 234–235, n. 31, 97 S.Ct. at 1799, n. 31.

The *Abood* decision bears further scrutiny. In *Abood* the Court held that public school teachers could not be compelled to support the political activities of a union to which they were required to belong by virtue of a state law. *Abood* also held that it was not incumbent upon the dissenting individual to have to object to the disputed activities nor to have to prove how much was spent on these activities by the union.[43] The plurality opinion stated that it favored an internal voluntary plan whereby objectors to legislative activity could obtain a refund of that portion of the dues spent for political purposes, and a reduction of future dues assessments to exclude that portion attributable to political activity.[44] But the Court in *Abood* did *not* provide any remedy as such. Rather it remanded the case for a determination as to whether the voluntary procedure instituted by the union after the litigation ensued, safeguarded the teachers' First Amendment rights.[45] The Court in fact specifically stated that:

"We express no view as to the constitutional sufficiency of the internal remedy described by the appellees. If the appellants initially resort to that remedy and ultimately conclude that it is constitutionally deficient in some respect, they would of course be entitled to judicial consideration of the adequacy of that remedy." *Id.* 431 U.S. at 242, n. 45, 97 S.Ct. at 1803, n. 45. See generally, "The Right of Ideological Non-association", 66 *Calif.L.Rev.* 767 (1978); "First Amendment Protection against governmental compelled Expres-

---

**40.** In fact to all the branches: Judicial, Legislative and Executive.

**41.** See 546 F.Supp. 1251.

**42.** 431 U.S. at 222–223, 235–236, 97 S.Ct. at 1792–1793, 1799–1800 (Stewart, J. plurality opinion); *Id.* at 243–44, 97 S.Ct. at 1803–1804 (Rehnquist, J., concurring); *Id.* at 244, 97 S.Ct. at 1804 (Stevens, J. concurring); *Id.* at 244–45,

97 S.Ct. at 1804 (Powell, J., concurring). Cf. *Galda v. Bloustein,* 516 F.Supp. 1142, 1148, 1150 (D.N.J., 1981) reversed 686 F.2d 159 (CA 3, 1982).

**43.** 431 U.S. at 238–241, 97 S.Ct. at 1801–1802.

**44.** 431 U.S. at 240, 97 S.Ct. at 1802.

**45.** 431 U.S. at 242, 97 S.Ct. at 1803.

sion and Association", *supra.* Cf. *Galda v. Bloustein, supra,* at page 167.

Nevertheless, the Colegio contends that a procedure created by it after the commencement of this action, pursuant to an order of the Supreme Court of Puerto Rico in *Colegio v. Schneider, supra,* is an "*Abood* remedy", and as such, is all that Plaintiffs are entitled to as relief, even assuming they show violation of their First Amendment rights.[46]

The Regulation in question[47] was approved by the Board of Governors on November 23, 1982 and distributed to the membership sometime thereafter. This regulation creates the "Board for the Revision of the Activities of the Colegio" (hereinafter called the "Board"), for the purpose of "passing judgment on the classification of the activities of the Colegio, the proportions between the ordinary ones and those of an ideological nature, the validity of any objections which a member may have as to any given activity, and over all controversies which may arise regarding the activities of the Colegio."[48] The Board is charged with balancing "the right of freedom of expression of the members of the Colegio who affirmatively express their objections to the activities of the Colegio, at the time of the payment of their dues,"[49] with the "necessity of maintaining a Colegio which is vigorous and faithful to its traditions and historical functions."[50]

The Board is composed of "seven lawyers of recognized prestige selected by the membership of the Colegio."[51] In point of fact, the Board was selected by the Board of Governors, who submitted seven candidates to be voted upon and blank spaces on the ballot for "write-ins".

Article 11 of the Regulation[52] charges the Board with the classification of the Colegio's activities "based on the definition of what is an ideological activity" as per an informative motion filed by the Colegio with the Supreme Court of Puerto Rico on June 25, 1982 in *Colegio v. Schneider, supra.* The import of that motion is to define as an "ideological activity" only those activities which are related to *partisan politics.*[53]

The Regulation sets up an elaborate and complicated procedure for the challenging of Colegio's activities by its members. Only those members "who at the moment of payment of their annual dues, have affirmatively expressed their objection to the use of their moneys in ideological activities pursuant to the definition that is given to said activities by the Board in coordination with the Board of Governors of the Colegio," may file a complaint or objection with said Board.[54] The complaint must be filed within 30 days after the activity takes place[55] and must "allege sufficient facts for the Board to grant a remedy."[56] If the Board finds merit in the complaint it will order the "return of the corresponding amount of money to the member who filed the complaint. Additionally, all other lawyers who at the time they paid their dues objected to their use for ideological purposes, shall also be notified. Once notified, they have 30 days within which to file a written claim before the Executive Director of the Colegio for the return of the same proportional amount that was returned to the member who initiated the complaint."[57]

As previously indicated, the Colegio hails this regulation as the panacea to all of Plaintiffs' claims. However, even assuming

46. See Generally Defendants' Post trial brief at page 64, *et seq.*

47. Defendants' Exhibit A.

48. *Id.,* Article 2.

49. Which are due by January 31 each year.

50. *Id.*

51. *Id.,* Article 3.

52. *Id.*

53. See Plaintiffs' Exhibit 32; also the testimony of Colegio's President, Arturo Negrón García.

54. Defendants' Exhibit A, Article 12.

55. *Id.,* Article 13.

56. *Id.,* Article 14.

57. *Id.,* Article 17.

that there is such a thing as an "*Abood*-type remedy," a contention which a careful reading of *Abood*'s multiple opinions puts in serious doubt,[57a] the Colegio's Regulation falls considerably short of the mark and, we are sorry to say, is illustrative of the cynicism and bad faith with which the Colegio has been handling the entire subject matter of the present suits.

To begin with, the Regulation covers only the question of annual dues. It completely ignores the issue of the funds raised through the purchase of forensic and notarial stamps. Apparently the Colegio thinks that the use of those funds for its ideological and/or political activism can continue without proscription. It is mistaken.

Second, by requiring beforehand that a member disclose his disapproval of ideological activities before he can qualify for "relief,", the Colegio shows either total disregard or unbelievable callousness as to the membership's right to be free from compelled expression. More than anything else in this case, this forced disclosure subjects the protesting member to the chilling effects of being singled out, vis-a-vis his peers, as the price for exercising his First Amendment rights. Furthermore, such a requirement infringes upon the individual's interest in selfhood, which is his freedom to decide how he will present himself to the world. See L. Tribe, *American Constitutional Law,* Sec. 15–5, see generally Secs. 15–1 to 21 (1978). See also *Whalen v. Roe,* 429 U.S. 589, 598–600, 97 S.Ct. 869, 875–877, 51 L.Ed.2d 64 (1977); *Roe v. Wade,* 410 U.S. 113, 152–154, 93 S.Ct. 705, 726–727, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). See also Gaebler, "First Amendment Protection Against Government Compelled Expression and Association," 23 *B.C.L.Rev.* 995, 1005 (1982). Cf. *Brown v. Socialist Workers '74 Camp. Comm.,* —— U.S. ——, 103 S.Ct. 416, 74

L.Ed.2d 250 (1982). As the Court in *Abood* stated:

"Disclosure of the specific causes to which an individual . . . is opposed (which necessarily discloses, by negative implication, those causes the [individual] does support) may subject him to 'economic reprisal, . . . threat of physical coercion, and other manifestation of public hostility, and might dissuade him from exercising the right to withhold support because of fear of exposure of [his] beliefs . . . and of the consequences of this exposure." (citations omitted) 431 U.S. at 241, n. 42, 97 S.Ct. at 1802, n. 42.

The Court quotes from Justice Jackson's famous statement in *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1942):

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act* their faith herein." (emphasis supplied) 431 U.S. at 235, 97 S.Ct. at 1799.

Third, the procedure established by the Regulation does not safeguard the rights of the dissidents. To begin with, the Board is a "captive organization," composed of "lawyers of recognized prestige," whatever that means, but in fact is named by the very group it is supposed to police,[57b] the Board of Governors, with whom it must "coordinate" its ideological definitions. Well, we know what *that* means. Next, the procedure is obviously set up to discourage the non-believers. They must object beforehand and then are required to keep abreast of everything happening in the Colegio's diverse internal and external activities so that they can detect objectionable conduct[57c] and file a protest within a specified time frame. Then, after an elaborate hearing they may receive reimbursement in ac-

---

**57a.** See again 431 U.S. at 242, 97 S.Ct. at 1803; See *Galda v. Bloustein, supra,* at page 167.

**57b.** The procedure resulted in the election of the Board of Governors' seven candidates. See Defendants' Exhibits A (Article III) and E.

**57c.** A burden that the Court rejected in *Abood.* See 431 U.S. at 241, 97 S.Ct. at 1802.

cordance with a vague "proportional" formula. In the meantime, the Colegio has used the dissident's money and has not even indicated to the general public the existence of such dissidence. In fact, all that the dissidents get for their troubles in exposing their dissent is the right to be ever vigilant for the opportunity to engage the Colegio in bureaucratic shadow-boxing.

Fourth, we must consider the Regulation in the light of the Colegio's definition as to what constitutes ideological activity, which it understands to be limited to mean, "partisan politics."[58] This, of course, is totally unacceptable and runs contrary to even the vague definition of "political activity" contained in *Abood*.[59] See also *Arrow v. Dow, supra*. Cf. *Lathrop v. Donohue*, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961); *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); Cf. *Galda v. Bloustein, supra*.

Last but by no means least, we must point out the differences between the situation before the Court in *Abood* and that faced by us here. To begin with, the state law in *Abood* permitted public employee unions, whereas here the state law actually *creates* the organization in question. Next, in *Abood* the questioned fee was negotiated freely between the union and the state-employer; here the *law itself* makes payment of Colegio's dues mandatory. Additionally, in *Abood* there was no direct financial support of the union by the state; here there is *direct and massive* financial support of the Colegio by way of mandatory dues and forensic and notarial stamps. Furthermore, in *Abood* the teacher did not have to belong to the union, but merely pay his fees; here you *must belong* to the Colegio in order to be a notary and to practice law. And lastly, in *Abood* there was no governmental enforcement machinery as such, but rather there was a contractual remedy, albeit permitted by the state; here it is the *government's enforcement* machinery that coerces membership in and financial support of the Colegio.

*Abood* and the present situation are light-years apart. We find it difficult to believe that, if faced with the present case, the Supreme Court of the United States would not distinguish *Abood* from the present case.

For all these reasons we conclude that the Colegio's Regulation does not in any way relieve the Colegio of the violations of 42 U.S.C. § 1983 which it committed and continues to commit. Furthermore, this Court considers that this Regulation is a sham, designed to forestall the adjudication of this case and the remedies to which Plaintiffs are entitled under the Laws and Constitution of the United States.

We have concluded that the Colegio engages in ideological and political activities in violation of Plaintiffs' Civil Rights. We must now determine the appropriate remedy to vindicate these wrongs.

### The Remedy

Plaintiffs in this case urge us to declare the unconstitutionality of Law 43[60] creating the Colegio as an integrated bar, as well as that of the stamp acts (Law 11, 99, Law 115, Law 198),[61] and to enjoin the future enforcement of these statutes. Plaintiffs also seek damages against the Colegio.

Based on the present-day state of the law, we cannot say that the general scheme promoted by these statutes is *on its face* unconstitutional. *Lathrop v. Donohue, supra*. *Lathrop*'s multi-opinioned decision is generally cited for the proposition that mandatory bar membership is constitutional, a rule which we are bound to accept. Although Puerto Rico has gone farther than any other jurisdiction known to us in

---

**58.** See Footnote 53a.; Cf., Footnote 5a.

**59.** Which defines political activism as any attempt to influence governmental policy-making. 431 U.S. at 231, 97 S.Ct. at 1797. See Footnote 5a regarding problems related to defining "ideological" and "political" activities.

**60.** 4 L.P.R.A. 771 *et seq.*

**61.** 4 L.P.R.A. 301 *et seq.*; 4 L.P.R.A. 785; 4 L.P.R.A. 1001 *et seq.*; 30 L.P.R.A. 2001 *et seq.*

supporting its integrated bar, the wisdom of this support is not for us to pass upon, but rather rests upon the Legislature and Supreme Court of Puerto Rico.

We are not bound, however, to accept the cold letter of these statutes as reflecting the true facts of life. As shown, the long-standing, pernicious and massive ideological and political practices, which have until recently been tolerated *sub silentio* and which are presently encouraged by the very state agencies charged with control and regulation of the integrated bar, present a very different picture as to how Law 43 and the related statutes are actually administered. These practices, we have held, are clearly unconstitutional. Such flagrant violations of the civil rights of Plaintiffs cannot be allowed to continue if *their* constitutional rights have any worth other than one of purely academic value. Without question, these violations of Plaintiffs' speech and associational rights cause them irreparable injury as to which there is no adequate remedy at law. See *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49

L.Ed.2d 547 (1975). They affect Plaintiffs' means of earning their livelihood in their chosen profession, and require that the Court, in the protection of their rights and because of the magnitude of these violations, exercise its equitable powers to its fullest extent to prevent further violations by Defendants.

█ In view of the above and the findings and conclusions of this Court, we must forcefully declare that Sections 3, 4, 10 and 11 of Law 43, that all that part of Section 6 dealing with the notarial stamp in Law 99, as well as similar language in Section 38 thereof, and that all of Law 115, *as interpreted, as enforced and as applied,* violate the speech and associational rights guaranteed by the First Amendment of the Constitution of the United States and are contrary to either the Fifth or the Fourteenth Amendments [62] of said Constitution.

It is thus appropriate that until such time as the Colegio ceases to engage in ideological and/or political activism, all Defendants, except the Justices of the Supreme Court of Puerto Rico,[63] their agents, employees, sub-

---

**62.** See *Examining-Board v. Flores de Otero* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).

**63.** In its opinion regarding a writ of mandamus requested by the Justices in this case, the Court of Appeals stated (See *In Re Justices of Supreme Court of Puerto Rico,* 695 F.2d 17, 23–24 (CA 1, 1982) (citations omitted)):

"... [A] court should not enjoin judges from applying statutes when complete relief can be afforded by enjoining all other parties with authority to seek relief under the statute. Indeed, it is ordinarily presumed that judges will comply with a declaration of a statute's unconstitutionality without further compulsion. In any event, there is no relief-related basis for including the judges in this law suit.

....

.... The Commonwealth Supreme Court has long claimed an *inherent* disciplinary power over members of the bar, including the power to discipline attorneys for causes other than those enumerated by statute. Moreover, the Supreme Court has asserted the general power to initiate a disciplinary proceeding itself, regardless of the involvement of the Colegio or the Secretary of Justice. Insofar as the plaintiffs direct their claims against the exercise of this disciplinary power, they are suing the Justices as 'enforcers' rather than as 'adjudicators.'

A review of the way in which the judges have exercised their enforcement power, however, makes clear that there is virtually no likelihood that this nonstatutory power could, or would, ever be exercised to enforce the membership and dues requirements at issue here. The Justices' attorneys have assured us that this power is exercised only with respect to attorney misconduct that occurs in proceedings before the Supreme Court itself ... *Should the plaintiffs succeed in setting aside the statutes, nonpayment of dues or refusal to join the Colegio would not constitute misconduct. There is thus no reason to believe that the Justices would penalize any such activity.*" (Emphasis supplied in this paragraph).

The Court of Appeals, on the basis of this finding, proceeded to hold that Plaintiffs had failed to state a claim against the Justices in their enforcement capacity *as to the membership and dues issues* and, because said conclusion was so influenced by Article III-type jurisdictional considerations, the Court issued a writ dismissing said claims as to the Justices. The Court went on to state, however:

"... The Justices' Article III position with respect to [the forensic and notarial stamp] claims, however, may be different, for here the Justices, and particularly the Chief Justice, may occupy a special administrative po-

ordinates, and all persons over whom control may be exercised by Defendants:

(1) Be enjoined from prosecuting or taking any action against any member of the Colegio for failure to pay, directly or indirectly, any due or fee prescribed by any law, regulation or practice of the Commonwealth of Puerto Rico or the Colegio;

(2) Be enjoined from denying or affecting the right of any person, otherwise duly qualified, to practice law and/or engage in notarial practice by reason of their failure to pay any due or fee to the Colegio which may be prescribed by any law, regulation or practice of the Commonwealth of Puerto Rico or the Colegio; or by reason of their refusal to be members of the Colegio;

(3) Be enjoined from selling any forensic or notarial stamp on behalf of the Colegio, or from using any public facility or funds for said purpose, or from forwarding to the Colegio the proceeds of any public funds collected on behalf of or for the Colegio, including but not limited to the sale of forensic or notarial stamps;

(4) Be enjoined from denying full legal validity to any pleading, public instrument or deed by reason of the failure of any person to adhere thereto and/or cancel therein any forensic or notarial stamp.

■ The remaining question, which is the claim for damages, is limited to Plaintiffs Oreste V. Ramos, Romany and Souss. There is no question but that the Colegio's actions have caused these Plaintiffs damages and that the Colegio's bad faith qualifies these damages for recovery pursuant to 42 U.S.C. § 1983. The problem, however, lies with a determination as to the amount to which said Plaintiffs are entitled. The evidence is too vague for the Court to establish through anything other than speculation, the amount of damages suffered by these Plaintiffs. Such conjecture would be contrary to good legal practice and is thus rejected. In view thereof, Plaintiffs Ramos, Romany and Souss are awarded nomi-

nal damages in the amount of $1.00 each against the Colegio.

Judgment granting a Declaratory Judgment, Permanent Injunction and Damages in accordance with this opinion shall issue forthwith. The findings of fact and conclusions of law appended hereto shall supplement this Opinion.

IT IS SO ORDERED.

*Declaratory Judgment, Permanent Injunction and Judgment of Damages*

In accordance with the opinion, findings and conclusions entered today by this Court, it is hereby ORDERED, ADJUDGED and DECREED:

(1) That Sections 3, 4, 10 and 11 of Law No. 43 of May 14, 1932, as amended, of the Commonwealth of Puerto Rico (4 L.P.R.A. 774, 775, 781, 783), as interpreted, enforced and applied are hereby declared to be violative of the First Amendment and of the Fifth or Fourteenth Amendments to the Constitution of the United States;

(2) That Section 6 of Law No. 99 of June 27, 1956 of the Commonwealth of Puerto Rico (4 L.P.R.A. 1006), commencing with that part of the second sentence of the section which reads "and a stamp to be adopted" and continuing through the end of said section, as interpreted, enforced and applied is hereby declared to be violative of the First Amendment and of the Fifth or Fourteenth Amendments to the Constitution of the United States;

(3) That Section 38 of Law No. 99 of June 27, 1956 of the Commonwealth of Puerto Rico (4 L.P.R.A. 1038), where it reads "as well as the proper bar stamps of the Bar Association of Puerto Rico," as interpreted, enforced and applied is hereby declared to be violative of the First Amendment and of the Fifth or Fourteenth Amendments to the Constitution of the United States;

sition. *See* 4 L.P.R.A. Sec. 1038. The Plaintiffs have a plausible argument that they are suing the Justices in their 'administrative' rather than their 'adjudicative' capacity. If

the Justices believe the contrary, they must make their argument first in the district court." *Id.* 695 F.2d at 25.

(4) That Law No. 115 of May 6, 1941 of the Commonwealth of Puerto Rico (4 L.P. R.A. 785), as interpreted, enforced and applied, is hereby declared to be violative of the First Amendment and of the Fifth or Fourteenth Amendments to the Constitution of the United States;

(5) That until such time as Colegio de Abogados de Puerto Rico cease to engage in ideological and/or political activism, all Defendants, except the Justices of the Supreme Court of Puerto Rico (see *In re Justices of Supreme Court of Puerto Rico,* 695 F.2d 17, 23 (CA 1, 1982)), their agents, employees, subordinates, and all persons over whom control may be exercised by said Defendants are hereby enjoined and prohibited forthwith from:

(a) Prosecuting, harassing or in any manner taking action against any person licensed to practice law, including notarial law, for failure to pay directly or indirectly any due or fee prescribed by any law, regulation, practice or custom of the Commonwealth of Puerto Rico or of the Colegio de Abogados de Puerto Rico;

(b) Selling any forensic or notarial stamp on behalf of the Colegio de Abogados de Puerto Rico, or from using any public facility or resource for said purposes, or from forwarding to the Colegio de Abogados de Puerto Rico the proceeds of any funds collected on its behalf but not transferred to it as of the date of this order;

(c) From denying full legal validity to any pleading, public instrument or deed by reason of the failure of any person to adhere thereto, and/or cancel therein, any forensic or notarial stamps; and

(d) From denying or affecting the right of any person, otherwise duly qualified to practice law and/or engage in notarial practice by reason of their failure to pay any due or fee to the Colegio de Abogados de Puerto Rico, or by reason of their non-membership in said organization, or by reason of the failure or refusal of said person to purchase and use, in the relevant pleading or public instrument, any forensic or notarial stamp.

(6) That the Colegio de Abogados de Puerto Rico pay the sum of one dollar ($1.00) each to:

(a) Oreste V. Ramos

(b) Jorge F. Romany

(c) Jorge Souss

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 16th day of June, 1983.

## APPENDIX

### Supplementary Findings and Conclusions

1.  All Plaintiffs are citizens of the United States, citizens and residents of the Commonwealth of Puerto Rico and were duly licensed and admitted to practice law and to act as notaries in said Commonwealth of Puerto Rico. Plaintiffs Oreste V. Ramos, Jorge F. Romany and Jorge Souss are all still actively engaged in the practice of law. Oreste Ramos and Romany are also licensed to act as notaries. Plaintiffs Hector R. Ramos and Robert E. Schneider were actively engaged in the practice of law, the first until his appointment as Secretary of Consumer Affairs and the second until his suspension, on June 3, 1982, by the Commonwealth Supreme Court for the non-payment of dues to the Colegio. Hector Ramos and Schneider both acted as notaries until their suspension as such by the said Court on June 3, 1982. Plaintiff Jorge Souss voluntarily withdrew from notarial practice in 1977.

2.  The Colegio is a juridical entity organized as a quasi-public corporation in 1933 pursuant to the provisions of Law 43.

3.  Defendants Secretary of Justice and Secretary of the Treasury, are the officers appointed by the Governor of Puerto Rico pursuant to Section 5 of Article IV of the Commonwealth Constitution to head the Departments of Justice and Treasury, respectively, two of the executive departments of the Commonwealth established pursuant to Section 6 of said Article IV.

4.  Defendant José Trias Monge, is the Chief Justice and Defendants, Carlos V. Davila, Hiram Torres Rigual, Jorge Díaz

Cruz, Carlos J. Irizarry Yunque, Antonio S. Negrón García and Francisco Rebollo, are all Associate Justices of the Commonwealth Court.

5. Plaintiffs, and all lawyers licensed to practice law in Puerto Rico, as a condition to their right to continue to practice law, are compelled by Law 43 to be members of the Colegio and to pay such annual dues as may be determined by the Colegio.

6. Plaintiffs, and all lawyers licensed to practice law and engage in notarial practice in the Commonwealth, are compelled by Section 6 of Law 99, to purchase, affix and cancel a notarial stamp issued by the Colegio on the original and .every certified copy of each public instrument (deeds, wills, powers of attorney, etc.) authenticated by them as notaries.

7. Plaintiffs, and all persons licensed to practice law in the Commonwealth, are compelled by Section 11 of Law 43, to purchase, affix and cancel a one dollar ($1.00) forensic stamp issued by the Colegio to the first pleading filed by them as lawyers in any judicial action or proceeding before the Commonwealth courts.

8. Law 115, requires that the Secretary of the Treasury sell Colegio notarial stamps and Colegio forensic stamps through the offices of the collectors of internal revenue of the Commonwealth, and to reimburse and remit to the Colegio the total amount of the sales made, without making any deductions from the selling price.

9. In accordance with Sections 28 and 38 of the Notarial Law (Law 99) (4 L.P.R.A. 1028, 1038) the original of every public instrument must be kept in a protocol in the office of each notary and is subject to strict supervision by the Chief Justice of the Commonwealth Supreme Court.

10. Section 38 of Law 99 (4 L.P.R.A. 1038) provides that the Chief Justice shall supervise the inspection of notarial offices and the examination of protocols of all notaries in the Commonwealth to see that all applicable laws have been complied with and that the proper Colegio stamps are affixed and cancelled on each original public instrument authenticated by said notaries.

11. Section 2 of Act Number 198, adopted on August 8, 1979 by the Legislature, as amended, (30 L.P.R.A. 2001), provides that the Secretary of Justice shall supervise the administration, direction and inspection of the Registries of Property of the Commonwealth.

12. Pursuant to the supervisory duties indicated in Finding No. 11 above, the Secretary of Justice enforces compliance with the provisions of Law 99 that compel lawyers engaged in notarial practice in the Commonwealth to purchase, affix and cancel Colegio Notarial Stamps on public instruments authenticated by them, by refusing to admit certified copies of such deeds to the Registry of Property for recordation unless the corresponding Colegio notarial stamp has been affixed and cancelled thereon.

13. The actions of Commonwealth officials as indicated in Findings Nos. 8, 9, 10, 11 and 12 above constitute state action in support of the activities of the Colegio within the meaning of the Fourteenth Amendment and 42 U.S.C. § 1983.

14. Article 29(2) of the By-laws of the Colegio provides that one of the duties of the Board is to take action to ensure that no person shall practice before the courts who is not a member of the Colegio and does not comply with the provisions of law or pay the corresponding dues or affix the Colegio forensic stamp to the first pleading filed in any civil or criminal action.

15. Article 36 of the By-laws of the Colegio provides for a Board of Directors composed of a President, the first and second Vice Presidents, Secretary, Treasurer, Assistant Treasurer and Assistant Secretary of the Board. It may be convoked by the Colegio president to take such measures as in his judgment are convenient for the proper operation of the Colegio.

16. Article 37 of the By-laws of the Colegio provides that the president of the Colegio is the official representative of the Colegio and has the power to name the

presidents and members of the permanent committees of the Colegio.

17. The president of the Colegio consistently and frequently conducts press conferences to which he invites members of the news media. Normally, the Colegio president conducts a press conference after each Board meeting to announce the resolutions, measures or official positions taken by the Colegio at such meetings.

18. The Colegio is a well known organization and any pronouncement made by it carries great weight in the media and in the opinion of the public, because it ostensibly represents all lawyers in Puerto Rico.

19. The Colegio has repeatedly and consistently affirmed and attested that its primary mission and purpose is not just to limit itself to matters that concern the legal profession and the administration of justice, but to inform, lead, orient and influence the community and society in general. The Colegio contends that it is authorized and empowered by law to bring "truth" to the people, and that it may and will engage in ideological activity.

20. The official position of the Colegio on any matter may be established by a pronouncement, a resolution, a measure or an expression adopted either by its President, its Board or its members at any annual or special meeting.

21. Any official position taken by the Colegio, whether as a result of a pronouncement by its President or action by its Board or its members at an assembly, constitutes the official position of the Colegio on that particular matter. All official positions of the Colegio are claimed and represented to be the position of all of the members of the Colegio, without any mention being made of the existence of any dissent or of any minority or contrary position being held by any of its members.

22. No official position of the Colegio, or resolution or measure of its Board or of its members has ever been approved, authorized or ratified by a majority of all of the members of the Colegio.

23. It is the official position of the Colegio that it will continue to engage in ideological and political activity that is not tied to the struggle of political parties for political power or to partisan politics.

24. The President of the Colegio has periodically appeared before the legislative committees of the United States Congress and of the Puerto Rico Legislature, and before the executive departments of the United States and of Puerto Rico and other bodies, both in and outside of Puerto Rico, to present the official position of the Colegio on various matters of an ideological or political nature.

25. Article 2 Section 2 of the Internal Regulations of the Colegio for the use and lease of its facilities and equipment provides that the Colegio may grant the use of sections of the building, free of charge, to groups or entities for social, cultural, professional and civic activities, including those of a religious or of a partisan political nature.

26. The Colegio has made and continues to make, its facilities, personnel and resources available to political and ideological groups for political and ideological activity and/or purposes, without charge or for a nominal charge.

27. The Colegio has, to the present taken official stands and positions in the name and on behalf of all of its members, including Plaintiffs, with regard to political and ideological matters.

28. The accounting system presently in use by the Colegio does not allow a determination regarding the cost that is properly allocated to ideological or political activities.

29. All of the official positions, actions and activities of the Colegio, its officers and agents, as well as those carried out through the use of its facilities, personnel and resources are taken and/or carried out under color of the authority granted by Law 43 and constitute state action within the meaning of the Fifth or Fourteenth Amendments and 42 U.S.C. § 1983.

30. The official positions, activities and actions of the Colegio over the past ten

years evidence a pattern of conduct by the Colegio to engage in, and to use the facilities, personnel and resources of the Colegio for ideological or political activity without restriction or limitation in the name and representation of all of the members of the Colegio, including Plaintiffs.

31. The Colegio uses, and has used, funds contributed by the payment of compulsory dues and the compulsory purchase of Colegio forensic and Colegio notarial stamps by Plaintiffs Jorge Souss, Oreste V. Ramos and Jorge F. Romany, within the year from the date of their filing of their complaints in this action, to defray the cost of ideological or political activities engaged in by Colegio, and the cost of making Colegio facilities, personnel and resources available to political and ideological pressure groups for such activities.

32. Plaintiff Jorge Souss paid his 1983 Colegio dues on February 5, 1983, but did not make any protest to the use of his dues by the Colegio. Subsequent to that date he received from the Colegio a copy of the Review Board Regulations. He objects to the use of his dues for ideological or political activities but does not want to reveal to what activities he objects. He paid his dues because it was the only way he could continue to practice law. He knew that if he did not pay he would be suspended and would be criminally liable if he tried to practice law after being suspended.

33. Plaintiff Oreste V. Ramos paid his 1983 Colegio dues on February, 1983, under protest. On June 8, 1982, prior to the filing of his complaint in this action, he tendered payment to the Colegio of his dues for 1982 by a check with a restrictive endorsement, limiting the use of the proceeds to defray the cost of group insurance for members and of printing and mailing the advance decisions of the Commonwealth Supreme Court. The Colegio received this check and issued a receipt for said payment. Subsequently the Colegio, by letter dated June 8, 1982, returned the check to Oreste Ramos stating that he could make his protest separately but that the Colegio would not accept a check with a restrictive endorsement in payment of dues. By letter dated June 30, 1982 the Colegio again wrote to Oreste Ramos advising him that he owed Colegio dues for 1982 and that his name would be submitted to the Colegio Board on July 10, and that the Board could order that a complaint be filed against him in the Supreme Court of Puerto Rico asking for his suspension for non-payment of dues. Thereafter, on September 21, 1982 Oreste Ramos paid his 1982 Colegio dues by check without restrictive endorsement, but filed a separate letter of protest. Oreste Ramos is in active notarial practice and complains that every time he affixes a Colegio stamp to a deed or to a pleading in court, and every time he pays his annual dues to the Colegio, he feels that he is subsidizing ideological and political activities and propaganda of the Colegio. He testified that during the past year the Colegio had brought Raul Roa, the Foreign Minister of Cuba, to Puerto Rico for a reception at the Colegio, and that he felt he was paying for the reception with the Colegio stamps that he bought and the dues that he paid. He also testified to attendance at several Colegio assemblies where he only attempted to vote once because the assemblies were very disorganized and like political rallies. The one time that he tried to vote someone kept trying to see him mark the ballot, so he finally voted openly and gave up any attempt to vote secretly. Oreste Ramos objected to the activities of the Colegio, but paid his dues because it was the only way he could continue to practice law. He not only filed an objection as to the use of his compulsory dues for ideological activities, but also objected to the requirement that he reveal his beliefs in order that his objection be considered.

34. Plaintiff Jorge Romany has not yet paid his 1983 dues. He did pay his 1982 dues under protest but only after the Colegio asked for his suspension from legal practice for non-payment of back dues owed to the Colegio. He normally delays payment of his dues until such time as the Colegio makes formal demand for payment. He objects to his compulsory contributions (both as to dues and from the purchase of Colegio stamps) being used by the Colegio

for ideological or political activities. He considered that the Colegio has engaged in extensive ideological and political activities. He paid his dues because that was the only way he could continue to practice law and he knew that if he did not pay the Colegio would act to have him suspended from practice.

35. All of the Plaintiffs except Jorge Romany testified that they did not want to have to reveal their individual beliefs in order to be able to practice law. All of the Plaintiffs objected to compulsory membership in, and compulsory contribution to, the Colegio (both by reason of the compulsory payment of annual dues as well as by the compulsory purchase of Colegio stamps) as a condition to their practicing law and acting as notaries so long as the Colegio was authorized and empowered to use its facilities, personnel and resources for ideological and political activities.

36. Plaintiffs Oreste V. Ramos, Romany and Souss have suffered and are suffering mental anguish because they are compelled to be members of an organization which engages in extensive ideological and political activity on their behalf but contrary to their beliefs. All Plaintiffs are suffering irreparable injuries by virtue of Defendants' actions and no adequate remedy at law is available to repair said injuries.

37. The actions of the Colegio are of a continuing nature.

38. Plaintiffs have stated and proven causes of action pursuant to 42 U.S.C. § 1983. This Court has jurisdiction over these actions by virtue of 28 U.S.C. § 1343.