Robert E. SCHNEIDER, Jr., et
al., Plaintiffs,

v.

COLEGIO de ABOGADOS de PUERTO
RICO, et al., Defendants.

Civ. Nos. 82–1459 (TR), 82–1513,
82–1514 and 82–1532.

United States District Court,
D. Puerto Rico.

March 3, 1988.

Oreste V. Ramos Diaz, pro se.

Jorge F. Romany, pro se.

Jorge Souss Shidrewa, pro se.

Héctor L. Márquez, Hato Rey, P.R., Robert E. Schneider, Jr., Santurce, P.R., Hector Urgell Cuebas, San Juan, P.R., Jorge L. Marquez, for plaintiffs.

Robert E. Schneider, Jr., pro se.

Pedro A. del Valle Ferrer, Federal Litigation Div., Dept. of Justice, San Juan, P.R., for Secretaries of Justice and Treasury.

Harry Anduze Montaño, Santurce, P.R., for Colegio and Fundación de Abogados.

Miriam Naveira de Rodón, Santurce, P.R., José Julián Alvarez González, University of Puerto Rico, School of Law, Río Piedras, P.R., Salvador Antonetti, Jay García Gregory, San Juan, P.R., for Justices of Supreme Court.

## OPINION AND ORDER

TORRUELLA, Circuit Judge.

### I. *History of the case*

Plaintiffs in this case have presented the court with a challenge, under 42 U.S.C. § 1983, to the requirement that they belong to the integrated bar association, the Colegio de Abogados de Puerto Rico ("Colegio" or the "Bar"), as a condition to the practice of law in Puerto Rico. The Association is funded through compulsory annual dues and the proceeds from stamps that must be purchased and affixed by lawyers and notaries to papers filed with the courts and to notarized documents. The court must therefore evaluate that integrated bar scheme, including the escrow/rebate procedure built into it. It must decide whether compulsory membership in the Colegio violates dissenting members' non-associational rights under the First Amendment, in light of the importance traditionally assigned to those rights, and in view of the governmental interests that prompt the regulation of attorneys and the practice of law.

In order to simplify the reader's task, the history of this hoary case will again be set forth. The Colegio instituted disbarment proceedings in 1977 against ninety-nine attorneys for failure to pay their annual dues. All but two—Robert E. Schneider and Héctor R. Ramos Díaz—paid the dues. These two argued that Law Number 43, 4 L.P.R.A. § 771, *et seq.* (establishing the Colegio de Abogados) violates the Constitution of the Commonwealth of Puerto Rico. The Supreme Court of the Commonwealth received the report of a Special Master in September of 1980, entertained proofs and stipulations by the parties until March of 1981, and issued its opinion. *Colegio de Abogados v. Schneider*, 112 D.P.R. 540 (1982) (hereinafter the "1982 Opinion"). That court ordered Schneider and Ramos to pay all dues owing the Colegio, and upheld the constitutionality of the integrated bar under the Constitution of Puerto Rico. It also announced that a procedure would be established, in cooperation with the Colegio, to ensure that dissenting members of the Bar would not be compelled to finance "ideological" activities through their bar dues.

In spite of the promised procedure, Schneider and Ramos refused to pay, and were consequently disbarred. They and three other plaintiffs (who had been paying dues and were not disbarred or subject to the 1982 Opinion) brought suit in federal court under 42 U.S.C. § 1983. That suit was limited to a claim for declaratory and injunctive relief from their *prospective* obligation to pay dues and belong to the Colegio. *Schneider v. Colegio de Abogados De Puerto Rico*, 546 F.Supp. 1251 (D.P.R.1982).[1] This court thus expressly dis-

---

1. That decision was affected by *In re Justices of the Supreme Court of Puerto Rico,* 695 F.2d 17

missed "[a]ll allegations or claims seeking in any way to modify, alter, challenge, or otherwise affect the outcome of the suspension for non-payment of *past* dues of plaintiffs Schneider and Ramos in [the 1982 Opinion], ... for lack of jurisdiction." *Id.* at 1276 (emphasis supplied).

Next this court addressed itself to the substantive issues presented by this case. *Schneider v. Colegio de Abogados de Puerto Rico*, 565 F.Supp. 963 (D.P.R.1983), vacated sub nom., *Romany v. Colegio de Abogados De Puerto Rico*, 742 F.2d 32 (1st Cir.1984). On the record before it, the court found that "the Colegio engages in ideological and/or political activity of a pervasive and continuous nature...." *Id.* at 965. It also noted that "there is no way of determining, from an accounting standpoint, the dollar amount of [support for ideological activities] except to conclude that from the pervasiveness, scope and breadth of this type of activity, it is obvious that the backing has been and is considerable." *Id.* at 971 (citing the testimony of Juan Espiet, the Colegio's auditor). In other words, the Colegio's expenditures in support of ideological activities were inextricably intermingled with its other, non-controversial expenditures.

On the basis of these and other findings, this court held that, as applied, Law No. 43 establishing an integrated bar violated dissenting attorneys' rights under the First Amendment. It ordered, in consequence, that the defendants (except for the Justices of the Supreme Court) be enjoined from taking any action based on plaintiffs' refusal to pay either the compulsory bar fees or the legal and notarial stamps. *Id.* at 979.

When called upon to review this opinion, however, the First Circuit declined to comment on the merits of the adjudication. *Romany v. Colegio de Abogados de Puerto Rico*, 742 F.2d 32 (1st Cir.1984). Instead, it found that this court should have abstained from deciding the issue until the Puerto Rico Supreme Court should issue the remedy it promised in its 1982 Opinion.

*Id.* at 40. The First Circuit grounded its holding on several premises that deserve mention here. It pointed out first that the Supreme Court had interpreted the Commonwealth's Constitution to require some sort of remedy for dissenting lawyers, parallel to the remedy required by the United States Supreme Court for dissenting workers in closed shop labor cases. *Id.* at 40 (citing *Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Railway Clerks v. Allen*, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963); *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

The First Circuit commented also that the Commonwealth Court has the power to determine the grounds for admission to the bar. It could, therefore, fashion a procedure parallel to that suggested in the above-cited cases, to safeguard dissenters' associational freedoms. Since the Supreme Court of Puerto Rico declared itself to be in the process of doing just that, the Court of Appeals reasoned, the federal courts should await the result. "[W]hile even provision of a remedy in *complete* compliance with *Abood* and its progeny would not necessarily signal the end of plaintiffs' federal case, it would surely transform it." *Romany*, 742 F.2d at 41 (emphasis added). The First Circuit added:

> Conversely, of course, to the extent whatever remedy the Supreme Court of Puerto Rico approves falls short even of the standards established in *Abood* and *Ellis*, plaintiffs will have a different, more specific and more powerful federal constitutional claim.

*Id.* at 42.

The Court of Appeals, as an interim measure, decided that the plaintiffs should put 50 percent of their dues into an escrow account, to be distributed to the Colegio and the plaintiffs pursuant to a final resolution of this litigation. Citing *Ellis v. Brotherhood of Railway Clerks*, 466 U.S. 435, 444, 104 S.Ct. 1883, 1890, 80 L.Ed.2d

(1st Cir.1982) where the Court of Appeals, on petition for writ of mandamus, dismissed plaintiffs' action against the Justices, except as nominal parties. *But cf. Forrester v. White*, — U.S.

——, 108 S.Ct. 538, 543–44, 98 L.Ed.2d 555 (1988) (no immunity from suit for damages by judges for administrative or rulemaking actions).

428 (1984) the First Circuit made the following statement:

> [W]e do not decide now whether dues reduction alone is a satisfactory answer to plaintiffs' complaint; but at least it is clear that, at a minimum, dissenting attorneys may not be forced to subsidize ideological activity outside the ambit of activities for which membership may properly be compelled. This being so, plaintiffs should not be forced to pay full dues to the Colegio while this litigation proceeds.

*Romany*, at 44.

This court accordingly held this suit in abeyance until the Puerto Rico Supreme Court should complete its rule-making procedure. The new rules for dealing with dissenting attorneys' dues finally issued on June 26, 1986, in the form of an opinion. *Schneider v. Colegio de Abogados*, 86 J.T.S. 10 (June 26, 1986) (hereinafter, the "1986 Rule").[2] The specific details of these rules will be explored further in considering their sufficiency under the First Amendment; for the moment it will suffice to sketch in their broad outlines. The Commonwealth court concluded that compulsory bar membership, the imposition of dues, and the required affixation of stamps (with proceeds to the bar) on legal documents were all constitutionally valid. It also decided that the Colegio should be free to engage in any activity authorized by Law No. 43, or by Court-ordered rules. It found, most importantly, that "the Bar Association may, constitutionally, pro nounce itself on ideological matters, but that the members who dissent from such pronouncements are entitled, under the Constitution of Puerto Rico, to object to the use of their contributions or of part thereof for the ideological activities they do not approve." *Schneider*, 86 J.T.S. 60, Official Translation at 1–2.

In order to protect this right to object, the court set up an interest-bearing escrow account, into which 15% of dissenting attorneys' fees would be deposited. At the end of the year, dissenting attorneys could specify particular "objectionable" activities, and receive a refund of a proportion of their dues equal to the proportion of total dues expended on those activities. Attorneys were also given the option of objecting throughout the year, on a case-by-case basis, to particular activities. A three-member panel, composed of retired members of the judiciary, was established to determine what activities are truly "objectionable," and to decide if the 15% figure should be altered at some later date.

The Puerto Rico Court opted for the term "objectionable" rather than "ideological" in describing impermissible expenditures. *Schneider*, 86 J.T.S. 60, Official Translation at 17. That decision was made, apparently, because that court felt that the Bar not only can and should speak out on many ideological issues, *Schneider*, 112 D.P.R. 540, 551 (1982), but can compel objecting attorneys to fund some of those expressions, as long as they are "comprised within the Bar Association's purposes and ends which are germane thereto...." 86 J.T.S. 60, Official Translation, at 17. The Bar Association's purposes—and, in consequence, the content of "objectionable activities"—are to be determined by reference to the powers granted the Bar by the Legislature or the Puerto Rico Supreme Court. *See, id.*, Official Translation at 17–18.

The issuance of the 1986 opinion reactivated the case now being decided. *Schneider*, 742 F.2d 32, 44 (1st Cir.1984) ("The district court may proceed after the Supreme Court of Puerto Rico has finally determined what remedy to provide...."). This court entertained several motions, set

---

**2.** As this court held on August 21, 1987, while the "remedy" was issued in opinion form, with a case heading, it is nonetheless "a rule promulgated in a non-judicial proceeding. It looks like a rule, reads like a rule, and acts like a rule." *Schneider v. Colegio de Abogados de Puerto Rico*, 670 F.Supp. 1098, 1102 (D.P.R.1987).

The Court attaches the "rule" label to the 1986 opinion not to engage in semantic game-playing, but in order to emphasize the opinion's true nature, and to avoid even the appearance of reviewing a judicial decision of the highest court of Puerto Rico. In the exercise of an over-abundance of care we state that it is only the validity of the 1986 Rule, as applied to the facts presented to this court, that we consider to be the case and controversy before this court.

a hearing date, and reopened the record to allow the parties to introduce additional evidence. The parties declined to present additional witnesses at the time of the hearing and limited their evidence to mostly irrelevant documents. The parties also chose—and this is of crucial significance for today's decision—to stipulate "that activities similar in nature to those undertaken by the Colegio prior to 1983 have continued." [3]

The defendant Bar Association then brought a motion to dismiss for lack of jurisdiction which the court decided this past August 21. *Schneider v. Colegio de Abogados de Puerto Rico*, 670 F.Supp. 1098 (D.P.R.1987). That opinion explained that this case did not constitute a review of any issues adjudicated by the Supreme Court of Puerto Rico in the earlier disbarment proceedings (the 1982 Opinion). Rather this case constitutes a challenge under the *federal* constitution to an integrated bar scheme. A challenge that was affected, but not mooted, by the Supreme Court of Puerto Rico's decision to implement—out of concern for the requirements of the Constitution of the Commonwealth of Puerto Rico—an escrow/rebate program for objecting attorneys.

This court found that, first, defendants had failed to challenge on appeal this court's initial assertion of jurisdiction. In any event, it held, the Supreme Court was acting in its rule-making capacity in promulgating the 1986 Rule, and federal adjudication of the constitutionality of a rule is appropriate even if the rule is enunciated

by the highest court of the Commonwealth. Furthermore, the case against Ramos and Schneider had ended already with their disbarment and subsequent reinstatement. *See Schneider*, 670 F.Supp. at 1102–03; *Schneider*, 546 F.Supp. 1251, 1274 (D.P.R. 1982). And, in fact, the 1986 Rule is not a remedy limited to the parties in a certain case, but applies to all dissenting attorneys whether or not they were parties to any of the cases discussed so far.

In that motion, the Colegio also claimed that either res judicata or collateral estoppel bar plaintiffs' claims in this court. Again, these issues were decided in this court's 1982 opinion, *see Schneider*, 546 F.Supp. at 1268–74, and not appealed, *see Romany*, 742 F.2d at 37 n. 6, and are therefore the law of the case. *Schneider*, 670 F.Supp. 1103. These objections lack substance in any event, as this court pointed out, because the requisite perfect identity for res judicata does not exist. *Id.* at 1104–05; and because the issues being decided here were not actually litigated or addressed by the Puerto Rico Supreme Court in its 1982 adjudication, in such a way as to trigger the issue-preclusive effect of collateral estoppel. *Id.*[4]

Before considering the relevant constitutional principles, it may be important to point out the reasons for the dissenters' discontent. This court found in 1983, and the parties' stipulation, *ante* at p. 677, now puts beyond dispute, that "the Colegio engages in ideological and/or political activism of a pervasive and continuous nature...." *Schneider*, 565 F.Supp. 963, 965

---

**3.** The Supreme Court of Puerto Rico, in its 1986 rule/decision, found that the Colegio's ideological activities are de minimis. The Colegio now argues that these findings are somehow binding on the court. That argument, however, is patently inconsistent, in light of the court's extensive findings in 1983, with the Colegio's stipulation set forth above. Nevertheless, it is the stipulation that binds the parties to this case. The court notes, however, that the perceived factual inconsistency between this court's findings and the Commonwealth's are due, at least in part, to a different conception of what are ideological activities.

More importantly, defendants failed, notwithstanding the Court's repeated invitations to that effect, to present any evidence concerning Cole-

gio's non-ideological activities. *See* Appendix A, which is a partial transcript of the proceedings.

**4.** The court decided these issues in 1982. *See Schneider*, 546 F.Supp. 1251, 1266–74. In 1987 it reconsidered, and again decided these issues adversely to the defendants. *See Schneider*, 670 F.Supp. 1098 (D.P.R.1987). It continues to find that reasoning persuasive, and deeply regrets that counsel for the Colegio continues to waste its time and the court's by devoting at least 27 of 50 pages in its latest Memorandum to the court, filed a short two months after this last opinion, to these twice-settled issues. Counsel would have done well to address himself more single-mindedly to the merits of this case—the only issues in contention today.

(D.P.R.1983). The court attempted to highlight the extent of the Colegio's involvement in issues of a highly partisan and divisive nature by giving examples of its activities, *see id.* at 965–71. Because of the importance of these findings of fact, and their present relevance in view of the pretrial stipulation of the parties, they are reproduced hereinafter (the footnotes in the original findings are excluded only for convenience; they are nevertheless part of our findings).

II. *Findings of Fact*

(1) At least since 1973, the President of the Colegio has made annual appearances before the United Nations to present the "official" position of the Colegio with regard to the political status of the Commonwealth of Puerto Rico to the effect that the Commonwealth is a colony of the United States, and to request that the "case" for its decolonization be submitted for action to the United Nations General Assembly. This position is espoused as representing the views of *all* the members of the Colegio.

The appearances by the Colegio before the United Nations' Decolonization Committee, as well as the substance of the Colegio's position therein, have received wide-spread publicity in Puerto Rico and in the international news media.

(2) The Board of Governors has adopted many resolutions dealing with diverse topics of an ideological and/or political nature. These include among others: condemning the Federal Bureau of Investigation for "intervention" with the Puerto Rican independence movement and its leaders (Plaintiffs' Exhibit 44); opposing an increase in the number of Federal Judges in Puerto Rico as an "attempt to fortify Federal Control over the island contrary to the duty of Congress to recognize the right of Puerto Rico to assume full sovereignty" (Plaintiffs' Exhibit 46); requiring that the President of the United States order the Navy to cease target practice in the island of Vieques and withdraw therefrom, "and that this resolution be sent to the Puerto Rican Legislature, to Congress, to the President, to the Decolonization Committee of the United Nations and to the media for massive promulgation" (Plaintiffs' Exhibit 49); resolving to "orient and inform" the people of Puerto Rico regarding the resolution of the Decolonization Committee of the United Nations regarding Puerto Rico (Plaintiffs' Exhibit 235 at p. 14. Resolution No. 6); condemning the Legislature of Puerto Rico for its "distortion [of] the historical truth" in condemning the previously referred to resolutions of the Decolonization Committee (Plaintiffs' Exhibit 235 at p. 29, Resolution No. 14); requesting the President of the United States that he release four Puerto Rican Nationalists convicted of participating in the shootings in Congress in 1952 (Plaintiffs' Exhibit 61); opposing a new voter identification system proposed by the Puerto Rico Electoral Committee (Plaintiffs' Exhibit 62); repudiating the Somoza regime in Nicaragua, supporting the Sandinista Front of National Liberation, and asking the United States to recognize the "Provisional Government of National Reconstruction" (Plaintiffs' Exhibit 235 at p. 66, Resolution No. 32); condemning the Russian invasion of Afghanistan (Plaintiffs' Exhibit 235 at p. 91, Resolution No. 43); expressing support for Olympic sports and that the Puerto Rico Olympic Committee be the one to decide whether or not to boycott the Moscow Olympic Games (Plaintiffs' Exhibit 235 at p. 92, Resolution No. 44); stating the Colegio's concern "in the name of all qualified voters" as to the state of the electoral process and authorizing the president of the Colegio to name a committee "to watch and guarantee the purity of the electoral process" (Plaintiffs' Exhibit 235 at p. 102, Resolution No. 51); expressing the Colegio's solidarity with the people of El Salvador and condemning the governing Military Junta (Plaintiffs' Exhibit 235 p. 114, Resolution No. 2); endorsing and supporting a march to be held favoring the movement to get the Navy to leave Vieques (Plaintiffs' Exhibit 236 at 129, Resolution No. 10); asserting the "defense" of Puerto Rican culture and rejecting "the efforts of the Commonwealth with relation to the Institute of Puerto Rican Culture as attempts to destroy the cultural heritage of

Puerto Rico" (Plaintiffs' Exhibit 235 at p. 135, Resolution No. 13); criticizing the United States for transferring Haitian refugees to Puerto Rico and demanding their immediate release to the mainland (Plaintiffs' Exhibit 235 at p. 149, Resolution No. 21); condemning the United States "for imposing a concentration camp on Puerto Rico in complicity with the Government of Haiti" (Plaintiffs' Exhibit 235 at p. 167, Resolution No. 30); opposing the use of the Federal Grand Jury system in Puerto Rico (Plaintiffs' Exhibit 235, at p. 137, 151, 162, Resolutions Nos. 14, 22, 28); blaming the police and the University Administration for the use of force in a strike by students at the University of Puerto Rico (Plaintiffs' Exhibit 235 at p. 201, Resolution No. 42); condemning the draft as a "blood tax paid by Puerto Ricans in the four wars fought in the Armed Forces of the United States" (Plaintiffs' Exhibit 235 at p. 203, Resolution No. 43).

All of the above have been widely disseminated by the Colegio throughout the news media, as a matter of practice and routine.

(3) The physical facilities of the Colegio have been routinely used for ideological and/or political activities unrelated to the purposes of the Colegio. These activities have included among others: a concert to raise funds for the accused in the armed robbery of a Wells Fargo truck; a press conference by the "Committee for the Defense of Our Dignity"; a press conference by the "Committee for the Defense of Democracy in Haiti"; numerous press conferences by labor unions; assembly of the "National Committee for the Defense of Vieques"; meetings of the "Committee for the Selection of Celeste as Mayor"; a press conference of the "Pastors' Association"; a seminar about the "organizational and political aspects of the Grand Jury"; press conferences of the Puerto Rican Socialist Party; press conference of the "United Committee Against Repression"; public hearing of the Central Committee of the Popular Democratic Party; meetings to organize a defense committee by the Puerto Rican Socialist League; a meeting of the leadership of the Popular Democratic Party

in San Juan; a meeting of the San Juan Zone of the Puerto Rican Socialist Party; an organizational meeting of "Citizens interested in the improvement of TV"; meetings of the "Crusade for the Rescue of Vieques"; a press conference of the "Artists in Favor of Artistic Freedom"; commemoration of the anniversary of the death of Dr. Pedro J. Chamorro; a press conference of the "Committee for the Defense of Puerto Rican Culture"; a press conference and meetings of the "Committee for the Defense of Nicaragua"; meetings of the "Law Students' Council" in connection with the strike at the University of Puerto Rico; a concert by the "Committee for the Defense in Support of the Puerto Rican Prisoners of War"; a press conference of the "Committee for the Rescue of Villa sin Miedo," as well as various meetings and conferences related thereto; a movie-showing by "Claridad," the official newspaper of the Puerto Rican Socialist Party, dealing with education in Cuba; a press conference by the Federation of University Students for Independence in connection with the "situation" at the University of Puerto Rico; an activity of the Puerto Rican Socialist Party in support of Cuba; a "cultural-political" activity by the "Committee for the Defense of Nicaragua"; a press conference by the local of the Professional Air Traffic Controllers Organization regarding their negotiations and strike; a showing of the movie "El Salvador; the people shall triumph," by the "Puerto Rican Committee in Solidarity with the Salvadorian People," as well as numerous other activities by said organization; a conference by the Dominican Revolutionary Party; meetings and press conferences of the "Committee Against the Uniform Increase in Tuition" of the University of Puerto Rico; a press conference of the Vieques Fishermen's Association regarding military maneuvers in the Caribbean Area; a press conference by the "Puerto Rican Ecumenical Social Action Committee" about the role of the "Church in the 80's"; an organizing meeting of the New Progressive Party followers of "Hernán Padilla for Governor"; the annual assembly of the "Puerto Rican Con-

federation of Spiritualists"; a press conference of the "National Ecumenical Movement" in support of the people of El Salvador.

Many of these activities were held without any charge being made by the Colegio to the sponsoring group, or with only a nominal fee being charged. Irrespective of whether or not a charge is made for the use of the Colegio's facilities, because of the continuous nature of these activities and the widespread publicity given to the fact that they take place in the Colegio's premises, a general impression is given that the Colegio is somehow associated in an active manner with at least some of these activities. This general impression is buttressed by the nature of the resolutions approved by the Board to which we have previously alluded, many of which in fact appear to complement the above-mentioned activities. The Colegio's total failure to disavow its sponsorship of the activities held within its premises does nothing to dissipate this impression.

(4) The Colegio also sponsors various publications. These include a law review, a monthly news letter and the miscellaneous reports of its various committees. Several resolutions and proceedings of the Board of Governors and of the general assembly, of an ideological or political nature, have been published in the Colegio's law review, a publication which receives wide dissemination in and outside Puerto Rico. Additionally, the law review publishes some articles which can only be cataloged as political or ideological rhetoric, with little, if any, relationship to the workings of a law journal. The monthly news letter is also used to disseminate the resolutions of the Board of Governors, some of which as previously indicated, have a strong ideological or political content. The program for the annual general assembly is also a source of publicity for ideologically-tainted resolutions, and is used as well for other proselytizing purposes.

Related to the above are the various committees and commissions of the Colegio. These groups issue reports on matters, including ideological and political issues, many of which have been the basis of the resolutions previously referred to herein. Many of these reports have been independently published by the Colegio, and their contents have received wide publicity and circulation throughout the Colegio membership and the general public.

(5) The Colegio has appeared either through testimony or by written briefs, before Congressional committees and before committees of the Legislature of Puerto Rico to present institutional views on behalf of the Colegio membership regarding pending legislation and other matters of a political and/or ideological nature. Examples of these activities include appearances before Congressional Committees considering legislation dealing with migrant farm workers, and similar appearances to oppose legislation to increase the number of District Judges in the United States District Court for Puerto Rico. Colegio President Tapia Flores also appeared in person before a committee of Congress considering the enactment of Spanish language legislation for the U.S. District Court in Puerto Rico. On a second occasion he appeared before a committee investigating Naval activities in Vieques. Colegio President Negrón García appeared before the Puerto Rico Legislature to condemn the Electoral Law of Puerto Rico, and to state the Colegio's position as to "what the electoral process in a democracy should be."

*Schneider,* 565 F.Supp. 963, 966–71.

(6) Although no evidence was presented by the Colegio regarding its non-ideological activities, we assume that these activities take place. There is, however, no way of deciding from the evidence before us the proportion of non-ideological to ideological activities. Considering the testimony of the Colegio's auditor, Juan Espiet, to the effect that there is no way of determining, from an accounting standpoint, the extent of nonideological versus ideological activities, and further considering the pervasiveness of the latter, we are forced to conclude that the ideological activities of the Colegio constitute a large and inseparable proportion of the Colegio's total activities.

III. *The relevant constitutional principles*

A. The First Amendment Principles

The court turns therefore to its principal task: deciding precisely "the ambit of activities for which membership [in the Bar] may properly be compelled," *Romany,* 742 F.2d at 44; and attempting to ensure that dissenting members are not forced to support ideological activity outside that ambit, if the rule set forth in the Commonwealth Court's 1986 opinion does not already do so. The court wishes to emphasize that it cannot and does not express any opinion regarding the validity of the integrated bar, including the escrow/rebate scheme, under the Constitution of the Commonwealth of Puerto Rico. *See Cuesnongle v. Ramos,* 835 F.2d 1486, 1492 n. 6 (1st Cir. 1987).

If there is any settled proposition in this area of the law, it is that a corollary of the First Amendment freedom of association is the right *not* to associate. *See, e.g., Abood v. Detroit Board of Education,* 431 U.S. 209, 234–36, 97 S.Ct. 1782, 1799–1800, 52 L.Ed.2d 261 (1977); *Chicago Teachers' Union v. Hudson,* 475 U.S. 292, 301, 106 S.Ct. 1066, 1073, 89 L.Ed.2d 232 (1986). Compelling an individual to contribute to a particular association, through dues and membership therein, necessarily has an impact on that right. *See Hudson, supra,* at 301, 106 S.Ct. at 1073.

Whenever the interests protected by the First Amendment are infringed, the courts must strictly scrutinize that government action to determine if it advances a compelling state interest. *See Elrod v. Burns,* 427 U.S. 347–362, 96 S.Ct. 2673–2684, 49 L.Ed.2d 547 (1976) (opinion of Brennan, J.) ("The interest advanced must be paramount, of vital importance. . . ."); *Buckley v. Valeo,* 424 U.S. 1, 44–45, 96 S.Ct. 612, 647, 46 L.Ed.2d 659 (1976) ("whether the governmental interests advanced in its sup-

port satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression"). Furthermore, the governmental compulsion must be "carefully tailored to minimize the infringement." *Hudson,* 475 U.S. at 303, 106 S.Ct. at 1074. In the words of the Supreme Court:

The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.

*Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984).[5]

The Supreme Court has dealt with the problem of compelled association in the union context. *See Chicago Teachers' Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Ellis v. Brotherhood of Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Brotherhood of Railway Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963); *International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed. 2d 1141 (1961); *Railway Employees Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). The principles expressed in these cases are controlling here, although the differences between bar associations and unions preclude a purely mechanical application. Even extrapolating directly from *Lathrop v. Donohue,* 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961), an early case dealing with the constitutionality of the integrated bar, is unlikely to prove very fruitful. *See Gibson v. The Florida Bar,* 798 F.2d 1564, 1566–67 (11th Cir.1986); *see also Abood,* 431 U.S. at 233 n. 29, 97 S.Ct. at 232 n. 29. Analysis of

---

5. Whatever confusion may have existed concerning the standard to be applied when an individual is compelled to pay dues to an association, *see* Sorenson, *The Integrated Bar and the Freedom of Nonassociation—Continuing Siege,* 63 Neb.L.Rev. 30, 62 (1983), was allayed by

*Hudson's* direct reference to traditional First Amendment analysis. *See Hudson,* 475 U.S. at 303 n. 11, 106 S.Ct. at 1074 n. 11; *see also Gibson v. The Florida Bar,* 798 F.2d 1564, 1569 (11th Cir.1986).

plaintiffs' claims therefore will require determining whether compulsory membership in the bar, with the present escrow/rebate system in place, is the least restrictive way to achieve Puerto Rico's compelling interests.

### B. Application of the First Amendment to the Colegio

#### 1. The Asserted State Interests

█ When announcing its new rule for dealing with dissenting attorney's fees, the Commonwealth court articulated several of the interests the integrated bar association is intended to further. Two were remarkably broad: "[t]he creation of a strongly pluralistic society ...," 1986 Rule, Official Translation at 13 (quoting *Colegio de Abogados de Puerto Rico v. Schneider,* 112 D.P.R. 540, 549 (1982)) and "contributing to the betterment of the administration of justice." *Id.* at 18.

One can hardly conceive of loftier goals in a democratic society than creating a strongly pluralistic society and improving the administration of justice. And yet broad statements such as these cannot form the basis for an infringement of First Amendment rights. If used at all they must be narrowly tailored. The Eleventh Circuit, for example, has somewhat artificially narrowed this "amorphous" interest:

> The Bar should construe "improving the administration of justice" as pertaining to the role of the lawyer in the judicial system and in society. The collective expertise of lawyers is grounded in their long-standing relationship with the courts. Lobbying activities that infringe upon individual rights should relate directly to that expertise.

*Gibson v. The Florida Bar,* 798 F.2d 1564, 1569 (11th Cir.1986). In a footnote it then gave examples of permissible lobbying subjects:

> Acceptable areas for Bar lobbying would include the following topics: (1) questions concerning the regulation of attorneys; (2) budget appropriations for the judiciary and legal aid; (3) proposed changes in litigation procedures; (4) regulation of attorneys' client trust accounts; and (5) law school and Bar admission standards.

*Id.* at 1569 n. 4. In commenting on a similar statement of purpose advanced by the New Mexico Bar, the district court stated:

> The standard urged by the Bar is an all-encompassing exception to the rule of *Abood.* It is difficult to conceive of an issue presented to the New Mexico Legislature which cannot arguably be related to the administration of justice or improvement of the legal system. The standard is too broad.

*Arrow v. Dow,* 544 F.Supp. 458, 462 (D.N. M.1982). If "the administration of justice" is deemed too broad a standard, what can be said of the "advancement of a pluralistic society"? Accepting these standards as the guides to determine permissible bar activity would be tantamount to a complete abdication of the court's duty to protect dissenting attorneys' First Amendment rights.

Besides their inherent ambiguity, these government interests read too broadly suffer from an additional fundamental flaw: Compelling association to further these interests acts directly to compel the expression of sensitive beliefs. As several Justices of the Supreme Court of Michigan recognized,

> [e]ven if the specific legislative political goals can be justified as advancing the public interest or improving the administration of justice, compelled support and association to further these activities is not constitutionally acceptable. The "public interests" and the "advancement of jurisprudence" are not unitary concepts subject to a single interpretation. Disagreements regarding legislative or other policy choices arise not only because they result in differing practical effects on individuals, but more importantly because they reflect differing ideological approaches to the subject matter. Such ideological beliefs, and association to promote or oppose such beliefs lie at "the core of those activities protected by the First Amendment." *Elrod v. Burns,* 427 U.S. 347, 356, 96 S.Ct. 2673,

2681, 49 L.Ed.2d 547 (1976) (plurality opinion).

*Falk v. State Bar of Michigan*, 411 Mich. 63, 305 N.W.2d 201, 218 (1981) (Ryan, J., joined by Moody and Fitzgerald, J.J.), *dismissed after further fact finding*, 418 Mich. 270, 342 N.W.2d 504 (1983) (*per curiam*).

In other words, lawyers would be compelled to express their opinion (or, worse, represent someone else's opinion as their own) on matters in which differing opinions are the product of *ideology*.[6] *Abood v. Detroit Board of Education* seems to state that such compulsion cannot be required as a condition for employment. *See Abood*, 431 U.S. 209 at 235, 97 S.Ct. 1782 at 1799. *Roberts v. United States Jaycees* reinforces this conclusion when it states that an infringement of First Amendment rights can only be justified by a compelling state interest "unrelated to the suppression of ideas." *Roberts*, 468 U.S. at 623, 104 S.Ct. at 3252.[7]

For all of the above reasons, therefore, the court must search for narrower expressions of the state interest, when attempting to justify the burden that compulsory association places on dissenting attorneys' freedom of association.[8] It is worth noting that the Supreme Court, faced with the agency shop, reacted in a similar manner. The inquiry was not whether the payment of dues was narrowly tailored to advance "labor peace"; but rather whether it narrowly remedied the free rider problem—the threat to labor peace. As a consequence, the Supreme Court decided objectors should only pay for those activities that directly benefited them and contributed to collective bargaining and contract administration (which are the Union's core contributions to labor peace). *See Ellis*, 466 U.S. 435, 447–48, 104 S.Ct. 1883, 1891–92.

## 2. The Permissible Purposes

◼ Certain state purposes for the bar are clearly acceptable,[9] and attorney discipline is one of these. The Commonwealth clearly has an interest in ensuring that attorneys, as repositories of the public trust, and as officers of the court playing a crucial role in determining the guilt or innocence of its citizens, are held to the highest level of integrity. The interest takes on even greater weight when one considers that only lawyers can be notaries in Puerto Rico, and that as notaries they validate all

---

6. The very fact that differences of opinion stem from varying ideologies renders much less compelling the state's interest in getting an *attorney's* opinion, since it is less likely to be informed by his or her particular expertise as a lawyer than by his or her political and ideological tendencies.

7. One commentator has summed up all these objections as follows:

> [Advancing the administration of justice is too broad.] Too broad, I presume, in two senses. First, given *Abood's* applicability, any such standard must enable the bar and ultimately the courts to discriminate between valid and invalid uses of compulsory dues in order to safeguard the First Amendment rights of captive dues payers. But this standard is far too vague to serve as a basis for any such discrimination. Second, the standard's breadth suggests that there is a compelling state interest in having the bar lobby on virtually any bill it chooses, which seems preposterous. Lawyers' expertise is surely more modest than that and ... bar position taking on some subjects germane to the administration of justice (e.g., no-fault auto insurance) may be so colored by lawyers' private interests as to have no distinctive, let alone compelling, public value.

*Sorenson, supra* n. 4, at 61 (footnotes omitted).

8. An additional reason for discarding these purposes may be pointed out: In light of the scope of the goal to be achieved (*e.g.*, a more pluralistic society) one may wonder if a compulsory bar association could ever be considered the means *least restrictive* of first amendment rights of reaching that ideal. Indeed, one may question whether compelling uniformity of expression is calculated to achieve a more pluralistic society at all.

9. The conclusions the court sets forth in the following pages have been culled from the few cases on point, *see, e.g., Gibson v. The Florida Bar*, 798 F.2d 1564, 1569–70 (11th Cir.1986); *Arrow v. Dow*, 544 F.Supp. 458, 461–63 (D.N.M. 1982), and from the commentators, *see, e.g.,* Schneyer, *The Incoherence of the Unified Bar Concept: Generalizing from the Wisconsin Case,* 1983 A.B.F.Res.J. 1, *passim;* Sorenson, *The Integrated Bar and the Freedom of Nonassociation— Continuing Siege,* 63 Neb.L.Rev. 30, 63–80 (1983); *Note*, Falk v. State Bar of Michigan: *First Amendment Challenge to Bar Expenditures,* 3 Det.Col.L.Rev. 737, 747–50 (1982), as well as from the articulations of state interest set out by the Supreme Court of Puerto Rico, *see Colegio de Abogados,* 86 J.T.S. 60 (1986).

sorts of public documents, acting essentially as public officers. *See Schneider,* 565 F.Supp. at 972 n. 34.

Furthermore, bar-controlled discipline is clearly a narrowly tailored method of policing attorneys. Lawyers themselves, better than anyone, know the pressures created by the practice of law. They can anticipate problem areas and effectively provide safeguards. Attorneys are uniquely qualified to strike the delicate balance between zealous advocacy and respect for the judicial system. Finally, they are in a particularly favored position to police themselves. While some aspects of this self-regulatory function may be seen to have ideological overtones (note, for example, the debate concerning attorney advertising), the weight of the interest and the bar's particular ability to advance it outweigh the burden on dissenting attorneys.[10]

A similar compelling state interest is upholding the competence of the members of the profession. The importance of skilled, well-trained lawyers to ensure the even-handed application of the laws is self-evident. The government may require the bar to assure that, through continuing legal education, bar admission standards, and the supervision of law schools, attorneys become and remain qualified to practice the law. Again, attorneys are singularly qualified and owe a certain duty to ascertain lawyers' most serious educational needs and the best ways to meet them.

A third constitutionally permissible end is increasing the availability of legal services to society. This includes traditional efforts like legal aid programs, public information regarding availability of legal services, and public education on substantive areas of law (*e.g.,* landlord-tenant law) that would increase citizens' ability to recognize and enforce their legal rights.[11] The reasons this can be seen as a compelling interest narrowly served by an integrated bar are similar to those described above: Law-

yers' collective expertise places them in a special position to perform this function. Furthermore, their position in society, as a link between the written law and its living expression, imposes certain special duties on them to make legal services available to those for whom legislation would otherwise remain behind an impenetrable veil. Decisions regarding the course society ought to take lie in the political realm; once those decisions are incorporated into legislation, lawyers may be required to ensure that the law is explained to society's members.

Finally, the special and intimate relationship between attorneys and the courts gives attorneys special knowledge in areas relating to the improvement of the functioning of the courts. *See Gibson v. The Florida Bar,* 798 F.2d at 1569. They include such subjects as evidentiary rules, rules of procedure, docketing matters, and similar methods of ensuring judicial efficacy and efficiency. Public commentary by the Bar Association on these subjects is not likely to seriously implicate attorneys' political beliefs. Furthermore, they are subjects that, because of their arcane nature, escape public scrutiny to a great degree, making commentary by the qualified segment of the public all the more vital.

There are some expenditures that are not challenged, and do not seem to present any First Amendment problems. We note, for example, that the Bar Association provides attorneys with life insurance. A fifth category, therefore, of permissible expenditures, are those with no expressive content, that convey no messages, and benefit all members equally. While not necessarily promoting a great public interest, these items do not act to infringe any real right to freedom of expression, and therefore need not be strictly scrutinized. *See Ellis v. Railway Clerks,* 466 U.S. 435, 456, 104 S.Ct. 1883, 1896, 80 L.Ed.2d 428 (1984).

The Bar's publications, of course, may meet all or none of these purposes. In this

---

**10.** One commentator, however, has suggested that if approximately 20 of 50 states manage equally well to perform all these functions by means of legislative regulation and judicial rulemaking, without a compulsory bar association, then it cannot be said that an integrated bar is

the least restrictive method of achieving *any* goals. *See* Sorenson, *supra,* at 69.

**11.** This should not be read, of course, as a license to lobby for new consumer legislation, for example, but simply as the ability to inform people of the state of the law.

case, the court has found that the Bar's various publications contain markedly ideological material. *See ante,* and *Schneider,* 565 F.Supp. 963, 969–70. As the Supreme Court has made clear, "[i]f the [Bar] cannot spend dissenters' funds for a particular activity, it has no justification for spending their funds for writing about that activity." *Ellis v. Railway Clerks,* 466 U.S. at 451, 104 S.Ct. at 1894. In view of the extent of political content in these magazines, and its intermingling with permissible content, the publications as they exist now cannot be funded by objecting attorneys. Furthermore, trying to separately account for the expense of each individual published item is the kind of burdensome nit-picking that itself chills the exercise of First Amendment rights. Each publication stands or falls, therefore, as an indivisible entity, depending on its editorial policy. If a magazine, for example, is a free forum for the exposition of educational articles reflecting different viewpoints, it passes muster.

It is entirely possible that additional legitimate areas of concern for the Bar may exist or may develop. It is unfortunate that, because plaintiffs' position is that no expenditures are permissible, and defendants' that all statutory purposes are permissible, the court has received no meaningful discussion of what means narrowly advance compelling state interests. This situation, as mentioned already, was aggravated by Colegio's insistence on procedural matters already repeatedly decided by this same court and its failure to supplement the record with any additional evidence from that previously presented.

IV. *The Constitutionality of the 1986 Rule* [12]

 As the court has pointed out, *see Schneider v. Colegio de Abogados De*

*Puerto Rico,* 565 F.Supp. 963 (D.P.R.1983), and the parties have stipulated, the Colegio uses a substantial portion of its budget to subsidize ideological activities. These are activities, as we have seen, for which support cannot be compelled. What we must now ascertain, therefore, is whether appropriate steps have been taken to ensure that dissenting attorneys' funds are not being used to finance those activities. The procedure that purports to do this is the 1986 Rule. *Schneider v. Colegio de Abogados,* 86 J.T.S. 10 (June 26, 1986). Whatever its value under the Constitution of Puerto Rico, however, it is clear that this remedy does not adequately safeguard dissenters' federal First Amendment rights.

As will be recalled, the rule defines "objectionable activities." It requires that 15% of annual dues be paid in to an escrow account for all those attorneys who enter general objections. It also provides that attorneys may object to specific activities, in which case it appears that the portion of their fees allocable to those activities will go into escrow. (While this last feature shows respect for members' feelings, it is clearly not compelled by the First Amendment, as the union shop cases make clear). At the end of the year, attorneys whose monies are in the escrow account can come forth and present, before a Review Board, their objections. Once the Review Board determines, under procedures yet to be set forth, which activities are objectionable and the costs allocable to them, a portion of the 15% would be returned to all objecting attorneys. This portion represents the proportion of their annual dues equal to the percentage of annual dues received by the Bar Association and spent on those objectionable activities.

Perhaps the most basic flaw in this arrangement lies buried in the rule's defini-

---

**12.** Although federal courts will often abstain when faced with a challenge to a new rule that lacks definitive interpretation by a state's supreme court, *Railroad Comm'n. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643 there is no need to do so here. The 1986 Rule is facially invalid. No interpretation by a court could limit the plain language of the rule regarding the ambit of permissible activities: the rule simply allows the court or the legislature to add permissible activities at will. That very uncertainty is fatal to its validity. Furthermore, the procedures it sets forth by no means adequately protect the dissenters. Finally, the harm is ongoing, and will continue, under the terms of the 1986 Rule. *Pullman* type abstention, therefore, is not required.

tion of "objectionable activities." The Commonwealth Court said: "Activities comprised within the Bar Association's purposes and ends which are germane thereto shall not be considered objectionable activities." 86 J.T.S. 10, Official Translation, at 17. A little later, the Court said:

"The functions and purposes of the Bar Association are:

\* \* \* \* \* \*

To exercise other powers conferred by law or by the Supreme Court of Puerto Rico and any other incidental powers necessary or convenient for the ends of its creation and which are not in disagreement with the purpose and the law which creates the Bar Association."

*Id.* at 18.

It is obvious that the mere fact that an act lies within the statutory powers of a quasi-official organization does not permit the state to compel dissenters to fund that act. In fact, that was the very issue the United States Supreme Court avoided in *International Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1748, 6 L.Ed.2d 1141 (1961), by interpreting a statute not to permit certain challenged activities.[13] More importantly, the Court explicitly held certain *statutory* purposes unconstitutional in *Abood v. Detroit Bd. of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). There the Michigan Supreme Court interpreted the relevant *statute* to permit unions to lobby the legislature on certain subjects. The Supreme Court of the United States nevertheless said that "[First Amendment principles] prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may oppose as a condition of holding a job...." *Abood,* 431 U.S. at 235, 97 S.Ct. at 1799.

To hold otherwise would be to permit the Commonwealth to determine, legislatively or by Court rule, the content of dissenters' First Amendment rights. The range of permissible compelled expression, as we have seen, must be determined by means of careful balancing of interests and rigorous

constitutional analysis, not merely by deferring to legislative judgments. Therefore, since the remedy does not properly identify the activities which cannot be funded through compulsory fees, it fails to bring the integrated bar into conformity with the First Amendment.

The infirmities of the 1986 Rule do not end here, however. The procedure it sets out falls short of some of the requirements elucidated already by the Supreme Court in the union shop cases. The percentage of dues assigned to the escrow account has been set at 15% by the Commonwealth, with power in the Review Board to change that figure "within what is reasonable ... according to the experience acquired." *Schneider,* 86 J.T.S. 60, Official Translation at 21. No justification is given for the 15% figure nor are any procedures set forth to allow objection to it or review of a decision to change that figure.

The Supreme Court made the requirements in this respect crystal clear:

[T]he "advance reduction of dues" was inadequate because it provided [objectors] with inadequate information about the bases for the proportionate share.... Basic considerations of fairness, as well as concern for the First Amendment rights at stake, also dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee. Leaving the nonunion employees in the dark about the source of the figure for the agency fee—and requiring them to object in order to receive information—does not adequately protect the careful distinctions drawn in *Abood.*

*Chicago Teachers' Union v. Hudson,* 475 U.S. 292, 306, 106 S.Ct. 1066, 1075, 89 L.Ed. 2d 232 (1986) (footnote omitted).

In any given year, therefore, the percentage to go into escrow must be based on the Colegio's projected budget, and on its estimate of expenditures to be made for objectionable purposes. Furthermore, the United States Supreme Court requires that the organization justify the dues to be collect-

**13.** An interpretation "not without its difficulties," *see Abood v. Detroit Bd. of Education,* 431

U.S. 209, 232, 97 S.Ct. 1782, 1798, 52 L.Ed.2d 261 (1977).

ed, not merely explain how the non-collected or escrowed fees will be spent. "An acknowledgment that nonmembers would not be required to pay any part of 5% of the Union's total annual expenditures was not an adequate disclosure of the reasons why they were required to pay their share of 95%." *Id.* at 307, 106 S.Ct. at 1076. In essence, the Colegio needs to make known to the members of the Bar—all of them—its proposed budget, allocating all the dues it intends to retain to one or other of the permissible ends set forth *ante.*

An additional reason to require *the organization* to explain in advance what its expenditures will be, and which are permissible, can be found in *Abood,* 431 U.S. at 241, 97 S.Ct. at 1802: "[To do otherwise] would also place on each employee the considerable burden of monitoring all of the numerous and shifting expenditures made by the Union that are unrelated to its duties as exclusive bargaining representative." The solution, of course, is simply to categorize each expenditure in the budget under one of those heads, and use the percentage of expenditures not so allocated as the escrow percentage.[14] If it is impossible to do so in advance of the Colegio's fiscal year, the percentage can be determined by reference to average past budget items, with a view to reasonably expected changes in spending habits.

In this way, then, the Colegio will bear the initial burden of justifying all its expenditures, as required by *Hudson,* 475 U.S. at 307, 106 S.Ct. at 1076. In addition, dissenters must have a right to object to that allocation. The burden then remains on the Colegio to show before an "impartial decisionmaker" (who must render a "reasonably prompt decision") that this expend-

iture is germane to one of the permissible purposes. *Id.* at 307, 106 S.Ct. at 1076. That impartial body, of course, could be the one already in place by virtue of the 1986 Rule: the Review Board. The objectors' participation in this procedure, the provision of an impartial forum, and the allocation of the burden of proof to the Colegio are all necessary components of the escrow/rebate scheme.

One last item to be noted in this respect is the need for a "buffer." This is a certain percentage of the funds in addition to the unallocated percentage discussed above that should be escrowed in order to ensure that, if the impermissible expenditures exceed the amounts budgeted for them, the amount to be returned does not exceed the escrowed amount. (Compare *Hudson,* at 295, 106 S.Ct. at 1070). While the Supreme Court has not explicitly required such a buffer, this Court deems it necessary to keep the First Amendment infringement to a minimum. It need not be excessive, however, since the Colegio has a right also to use non-dissenters' fees in any way it chooses. *See Railway Clerks v. Allen,* 373 U.S. 113, 122, 83 S.Ct. 1158, 1163, 10 L.Ed.2d 235 (1963); *Colegio de Abogados,* 86 J.T.S. 60, Official Translation at 1 (citing *Colegio de Abogados,* 112 D.P.R. 531 (1982)). The buffer will need to be larger, of course, if the percentage escrowed is based on past budgets rather than the specific annual budget since the calculations will necessarily be more imprecise.

The buffer could be determined by reference to traditional levels of spending as reflected in past budgets, and traditional levels of overspending budgetary prognostications. Should improper expenditures still exceed the escrowed amount they

---

**14.** It is noteworthy that *Hudson* does not require "absolute precision" in this respect. *See Hudson,* 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18. The Court recalls also that Colegio's auditor once testified that it was impossible to isolate ideological from other expenditures. *Schneider,* 565 F.Supp. 963, 971 (D.P.R.1983). Apparently, however, the situation has changed:

The Bar Association carries a strict bookkeeping of its income and expenses. It has a competent and responsible internal and external auditing system. It has devised a system

by virtue of which it is possible to determine the direct and indirect cost of any activity in such a way that anybody can accurately say what contribution would correspond per bar member to a specific activity.

*Schneider,* 86 J.T.S. 60, Official Translation at 12. Therefore, it seems not unreasonable, indeed required in order to narrowly tailor this scheme, to demand as much precision as is practically possible, so as to protect dissenters' First Amendment rights more adequately.

should be returned with interest. While this would still work a temporary loan such as the court found impermissible in *Ellis v. Railway Clerks*, 466 U.S. 435, 443, 104 S.Ct. 1883, 1889, 80 L.Ed.2d 428 (1984), it at least would be infrequent and inadvertent. It would satisfy, therefore, the "narrowly tailored" requirement.

As a separate matter, the 1986 Rule requires dissenting attorneys to object at the end of the year to specific activities they do not wish to fund. 1986 Rule, § C(2)(a), Official Translation at 21. The general objection filed initially acts merely as a "notice of the right to object," and no refund is made until the Review Board adjudicates the specific objections. 1986 Order, § C(3)(e), *id.* at 22–23. That, of course, violates the specific mandate of *Abood*, 431 U.S. at 241, 97 S.Ct. at 1802: "To require greater specificity [in objecting] would confront an individual employee with the dilemma of relinquishing either his right to withhold his support of ideological causes to which he objects or his freedom to maintain his own beliefs without public disclosure" (footnote omitted). Once it is determined how much was spent for the activities forecast in the budget that do not come under one of the permissible headings, all those who made general objections should automatically be refunded the proper proportion of their funds.

One of plaintiffs' complaints is not only that they must make specific objections, but that these objections and their subsequent adjudication are to be made public. 1986 Rule, § B(9), C(3)(a) Official Translation at 20, 22. As is apparent from the earlier discussion, the determination that a certain activity has been deemed objectionable by the Colegio (or, after a challenge, by the Review Board) must be made known to all members of the Colegio. However, the identity of the dissenters and of those who challenge particular allocations in the budget must not be made public.

While the plaintiffs also argue that the neutrality of the Review Board is suspect, the court refuses to entertain this argument. The Review Board is composed of former members of the Supreme Court of Puerto Rico, and other ex-judges. Such a board meets the requirements of an "impartial decision-maker," at least facially until appropriate evidence is presented to the contrary.

■ Finally, the government collects the revenues from the judicial and notarial stamps and remits those revenues to the Bar Association without charging costs of administration and processing. Plaintiffs complain that their tax monies are in this way being used to support the Colegio. The 1986 Rule limiting expenditures of the stamp revenues to non-objectionable activities would adequately protect dissenters' right not to fund ideological activities.[15] If a future rule is approved that complies with the principles stated so far, it would also include such a limitation, and stamp expenses would not pose a problem. If, on the other hand, no such rule is forthcoming, plaintiffs' position with respect to the tax monies spent on stamps will be radically altered. In this latter posture, as set forth below, plaintiffs would have no standing to challenge government spending to collect the stamp revenues.

Once the compulsory bar and stamp affixation schemes are held unconstitutional, they become essentially voluntary. Plaintiffs, as objectors, would presumably choose not to pay membership dues or purchase legal or notarial stamps. Once they make this choice, their only injury, and they admit as much in their post-trial memorandum, is the generalized injury suffered by all taxpayers a fraction of whose contributions are used to support this program.

---

**15.** As a practical matter, by simply subtracting the dollar amount of stamp revenues from the *revenues* in the budget and an equal amount of *permissible* expenditures from the expenses side of the budget, before calculating the percentage of dues that must be refunded or escrowed, the Colegio can ensure that none of the stamp monies are spent on objectionable activities. We assume, of course, that objectionable activities can be funded *in toto* with the annual dues of non-objecting members, without making use of any income proceeding from dissenters' pockets, either through stamps or dues.

To claim relief, therefore, they must assert taxpayer standing.

These plaintiffs do not meet, however, any of the requisites for taxpayer standing. First, they challenge not a spending program, but the incidental expenses of regulating the Bar Association. *Compare, Flast v. Cohen,* 392 U.S. 83, 102–03, 88 S.Ct. 1942, 1953–54, 20 L.Ed.2d 947 (1968) ("It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute."). Second, *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), and *Schlesinger v. Reservists' Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) "make it clear that a direct injury, and not merely a general interest common to all members of the public, is required for standing." C. Wright, *Law of Federal Courts,* 67 (4th Ed.1983). Without further analysis, we conclude plaintiffs lack standing to challenge the use of tax money to collect and transfer to the Colegio the revenues from stamps.

■ A separate word is yet in order about stamp revenues, as opposed to the expenses incurred by the Secretary of the Treasury in collecting those revenues. The Bar Association argues that the stamp issue is moot because of the Puerto Rico Court's earmarking of stamp proceeds. The Court also notes Colegio Resolution No. 1 (September 3, 1983), designating stamp proceeds to the purchase of attorney life insurance. Under the terms of this order, however, membership in the Bar becomes voluntary, and the Bar is under no *constitutional* compulsion to limit its activities in any way. No guarantee exists, therefore, that use of the stamp money will be curtailed to a particular kind of activity.

Faced with the same argument, the Supreme Court rejected it: "It is clear 'that voluntary cessation of allegedly illegal conduct does not moot a case.'" *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 305 n. 14, 106 S.Ct. 1066, 1075 n. 14, 89 L.Ed.2d 232 (1986) (quoting, *inter alia, United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968)). As here, the defendant in *Hudson* was "free to return to his old ways," and would otherwise be granted "a powerful weapon against public law enforcement." *Ibid.* The court is not convinced that the Colegio has "satisf[ied] the heavy burden of persuasion which [the Court has] held rests upon those [making this argument]. *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. at 203, 89 S.Ct. at 364.

Furthermore, and more importantly, the dissenters will obviously choose not to remain members of the Bar. To force *them* to pay for part of the members' life insurance, for example, is just another way of compelling support for the Colegio's activities. Even though the specific activity for which the money is earmarked is innocuous, the stamps would, in effect, be nothing but a levy imposed on dissenting attorneys for the benefit of those who choose to join the Colegio—now a voluntary association free to be political.

In addition, as long as the insurance benefits only members, earmarking those funds would be nothing more than the bookkeeping trick dismissed by the Supreme Court in *Abood v. Detroit Bd. of Education,* 431 U.S. 209, 237 n. 35, 97 S.Ct. 1782, 1800 n. 35, 52 L.Ed.2d 261 (1977). Any funds from dissenters that relieved the members of even non-political expenses would merely free up additional assets for use in ideological activities. This kind of support for the Colegio must, therefore, be enjoined, until adequate protection for objecting attorneys is put into place.

## V. Conclusion

While all other aspects of the 1986 Rule appear to pass constitutional muster, it is apparent from the shortcomings just highlighted that the Rule fails to adequately protect dissenters' rights. In the absence of such protection, or until the Colegio ceases *all* ideological activities not germane to the purposes expressed in this opinion, compelled membership in the Colegio de Abogados is unconstitutional. Therefore, under the present circumstances, the Commonwealth cannot continue to

make membership in the Bar, or its support, through the affixation of stamps, a precondition to the practice of law.

The court believes, however, that a remedy incorporating the features of the 1986 Rule not inconsistent with this opinion and additional safeguards in line with the principles expressed herein is feasible. The Court therefore will delay the entrance of judgment in this case for 60 days from the date of this order, to provide the Commonwealth with time to set in place such a remedial rule, if it so wishes. If the parties have not presented the court, before 60 days, with a scheme that meets the necessary requirements, the defendants will be prevented from imposing any negative consequences upon lawyers who fail to pay their dues or affix legal or notarial stamps to any legal documents.

In conclusion, the court finds that Sections 3, 4, 10 and 11 of Law 43, and such part of Section 6 of Law 99 as deals with the notarial stamp, as well as the analogous provisions of Section 38 of that law, and all of Law 115, as interpreted, enforced and applied, are in violation of the basic guarantees of freedom of expression and association embodied in the First Amendment of the Constitution of the United States, and therefore contravene either the First or the Fourteenth Amendment to that Constitution.[16]

The plaintiffs also request an award of damages for past infringements of their rights. Since no additional evidence has been introduced, the court is forced to come to the same conclusion it reached in 1983:

There is no question but that the Colegio's actions have caused these Plaintiffs damages and that the Colegio's bad faith qualifies these damages for recovery pursuant to 42 U.S.C. § 1983. The problem, however, lies with a determination as to the amount to which said Plaintiffs are entitled. The evidence is too vague for the Court to establish through anything other than speculation, the amount of damages suffered by these Plaintiffs. Such conjecture would be contrary to

good legal practice and is thus rejected. In view thereof, Plaintiffs are awarded nominal damages in the amount of $1.00 each against the Colegio.

*Schneider*, 565 F.Supp. 963, 979.

In view of the findings and conclusions set forth above, it is hereby ORDERED, ADJUDGED AND DECREED, on a date 60 days from the date of this opinion, and unless the court at that time orders otherwise:

(1) That Sections 3, 4, 10 and 11 of Law No. 43 of May 14, 1932, as amended, of the Commonwealth of Puerto Rico (4 L.P.R.A. 774, 775, 781, 783), as interpreted, enforced and applied are hereby declared to be violative of the First or Fourteenth Amendments to the Constitution of the United States;

(2) That Section 6 of Law No. 99 of June 27, 1956 of the Commonwealth of Puerto Rico (4 L.P.R.A. 1006), commencing with that part of the second sentence of the section which reads "and a stamp to be adopted" and continuing through the end of said section, insofar as it deals with Bar Association stamps, as interpreted, enforced and applied is hereby declared to be violative of the First or Fourteenth Amendments to the Constitution of the United States;

(3) That Section 38 of Law No. 99 of June 27, 1956 of the Commonwealth of Puerto Rico (4 L.P.R.A. 1038), where it reads "as well as the proper bar stamps of the Bar Association of Puerto Rico," as interpreted, enforced and applied is hereby declared to be violative of the First or Fourteenth Amendments to the Constitution of the United States;

(4) That, as of the effective date of this order, and until such time as the Colegio de Abogados de Puerto Rico ceases to engage in ideological and/or political activism, or sets in place an adequate protective mechanism in compliance with the First Amendment principles explained herein, all Defendants, except the Justices of the Supreme Court of Puerto Rico (*see In re Justices of*

**16.** *See Examining Board v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).

*Supreme Court of Puerto Rico,* 695 F.2d 17, 23 (1st Cir.1982)), their agents, employees, subordinates, and all persons over whom control may be exercised by said Defendants are hereby enjoined and prohibited forthwith from:

(a) Prosecuting, harassing or in any manner taking action against any person licensed to practice law, including notarial law, for failure to pay directly or indirectly any due or fee prescribed by any law, regulation, practice or custom of the Commonwealth of Puerto Rico or of the Colegio de Abogados de Puerto Rico, that is intended to fund the Colegio de Abogados;

(b) From denying full legal validity to any pleading, public instrument or deed by reason of the failure of any person to adhere thereto, and/or cancel therein, any forensic or notarial stamps; and

(c) From denying or affecting the right of any person, otherwise duly qualified to practice law and/or engage in notarial practice by reason of their failure to pay any due or fee to the Colegio de Abogados de Puerto Rico, or by reason of their non-membership in said organization, or by reason of the failure or refusal of said person to purchase and use, in the relevant pleading or public instrument, any forensic or notarial stamp.

(5) That the Colegio de Abogados de Puerto Rico pay the sum of one dollar ($1.00) each to:

(a) Robert E. Schneider
(b) Héctor Ramos
(c) Oreste V. Ramos
(d) Jorge F. Romany
(e) Jorge Souss

IT IS SO ORDERED.

## APPENDIX A

Excerpt of Hearing Before Judge Torruella, July 8, 1987

THE COURT: Before you rest, I would like to say something for the record. I don't want any misunderstandings. I understand the record in this case to be the evidence that has been presented before the Court today and at the prior hearing. If it's not presented before this Court, it is not evidence unless I can take judicial notice, of course.

Secondly, there is a stipulation that has been referred to by plaintiff that is in the record that reads, "The plaintiffs and the Colegio stipulate that activities similar in nature to those undertaken by the Colegio prior to 1983 have continued." That is evidence.

I would like also to state for the record that in my opinion—which should speak for itself, but I would like to be sure that there are no misunderstandings—I stated on page 97 of 575 Federal Supplement—

MR. ANDUZE: 575, your Honor?

THE COURT: Yes, 575 Federal Supplement, at page 97 I stated, "Furthermore, there is no way of determining from an accounting standpoint footnote 24, testimony of Juan [Espiet], Colegio auditor, the dollar amount of this support—" talking about the support for ideological activities "—except to conclude that from the pervasiveness, scope and breadth of this type of activity it's obvious that the backing has been and is considerable."

I would also like to state for the record—

MR. ANDUZE: Excuse me, your Honor. You were referring to footnote number what?

THE COURT: Twenty-four. The Court, without any analysis on my part, reads, "Furthermore, there is no way of determining from an accounting standpoint the dollar amount of their support except to conclude that from the pervasiveness, scope and breadth have this type of activity it's obvious that the backing has been and is considerable."

Furthermore, I would like to state for the record—well, what is in the record Colegio has never presented any evidence before this Court before or—at [least] up to now—concerning any other activities engaged in by the Colegio.

MR. ANDUZE: What do you mean by "any other activities"?

THE COURT: The record is—the only record that I have before me is the evi-

dence that has been presented up to now. I have no way of making any findings as to anything except what has been presented before me, at the last hearing and at this hearing.

MR. ANDUZE: Well, your Honor—

THE COURT: Let me finish.

MR. ANDUZE: I am sorry.

THE COURT: So I am asking you again if you—with what I have just stated if you have any other evidence to present to this Court?

MR. ANDUZE: Your Honor, the Colegio de Abogados has requested your Honor to take judicial notice of the June 26, 1986, opinion of the Supreme Court. In said opinion the Supreme Court makes an extensive analysis of the documentary evidence before that Court and before this Court. It makes an evaluation of the dollar amount of the activities that the Supreme Court found that may be ideological in nature or non-germane in nature, and the Supreme Court states very plainly that they are found to be [de minimus]. I agree with your Honor that even if they are [de minimus] they might be substantial.

THE COURT: Don't agree with me. I haven't said they were [de minimus]. As a matter of fact, I will also point out as part of my statement that the plaintiffs, as I understand at this stage of proceeding, are challenging the so-called remedy, they are challenging the validity of the 15 percent. As I read the cases—and this is also under issue—as I understand it, once there is a challenge made to that amount, the challenged party has the burden of proof of establishing before the challenged body, which is this one, the validity of that figure.

MR. ANDUZE: Well, your Honor, the problem is that you are [applying] to the this matter other cases that analyze a procedure that is being—that was followed or a system that was established by one of the litigant parties, and that was within the control of that litigant party.

THE COURT: Look, I understand your arguments on jurisdiction and all these other matters. I am stating for the record the

way I see the case right now, and I am giving you the opportunity at this time to add any other evidence you feel is relevant to the way you see the case. I may be wrong after I read your motions and so on and so forth. This may all be academic, but I don't want you coming in later and claiming you were not given the opportunity.

MR. ANDUZE: Your Honor, I appreciate your comments most definitely, and that's why I am trying to present this to the Court, because maybe the Court will be able to eliminate me further as to any comments. Let—may I finish my statement, please?

THE COURT: Go ahead.

MR. ANDUZE: Sir, the reason I brought up the question of the procedure followed by the Supreme Court is that in the cases concerning the unions and the so-called free riders on all those cases that have to do within the context of union fees and dues, it was the union who was the party empowered and were controlled to establish the procedure.

Therefore, the Court can come and say, "You have the burden of showing this and this and that," but in this case the procedure, the remedy and the percentages and everything that is established is not established by the Colegio de Abogados. I cannot even if I show you 20 percent, 10 percent, 12 percent. It would be immaterial because it would not be within the realm of possibility for Colegio to change what the Supreme Court of Puerto Rico has established to be the remedy. We are in a different footing as to that possibility to a union, to a teachers association, to an air stewardess association, any of the other cases, railway employees, that are the groups that have been analyzed by the cases concerning the establishment of the remedy.

THE COURT: Maybe not all those cases are applicable to this situation. Maybe this is something altogether different.

MR. ANDUZE: Well, I think that they are guidelines as to the rights of the [dissenters], but the reality of the operational

aspect of establishment of the remedy, I believe that is very much different because it is within the Supreme Court's judicial power and as exercised in the two opinions issued by the Court concerning the establishment of that remedy.

So what Mr. Schneider wants me to show is something that has no bearing as to this Court's decision, even if it had jurisdiction, even if it found that there was a case on controversy that the Court may decide. So that's why I understand it to be very important to make that distinction to the Court that we are not in the same situation or same position as a union or a trade association with the power to amend or change or establish a remedy on our own volition.

THE COURT: Well, there is something else that I neglected to state. In view of the stipulation that has been entered into by the parties I don't know that it's necessary that I admit into evidence any of those documents that you brought today. After I issued the order I read the file, and I thought that maybe I shouldn't have issued the order.

MR. ANDUZE: Well, your Honor, the stipulation says what is a fact of life, the Colegio de Abogados has continued to conduct activities, continued to publish a law review, has continued to have activities in those regards, it has continued to do activities similar.

THE COURT: Well, the only reason—

MR. ANDUZE: Similar activities from 198[3].

THE COURT: The only reason I issued my order was to give you the opportunity to bring up to date the findings of the prior opinion. Now, there is no reason to clog up the records with a whole bunch of papers in view of that stipulation. I am telling you that I am not going to then require the submission of these documents because it's unnecessary in view of the stipulation.

MR. ANDUZE: Well, your Honor, the stipulation has said—

THE COURT: Whatever it says is in the record. All right, in view of what I said, are you going to offer any evidence?

MR. ANDUZE: No, your Honor.

THE COURT: All right, thank you. Other defendants?

MR. VAN DERDYS: No, your Honor. [We] join the position expressed by Brother Counsel Anduze.

THE COURT: All right.